ELLIOTT ASSOCIATES, L.P., Plaintiff,

v.

The REPUBLIC OF PERU, Defendant.

ELLIOTT ASSOCIATES, L.P., Plaintiff,

v.

Banco DE LA NACION, Defendant.

Nos. 96 Civ. 7917(RWS), 96 Civ. 7916(RWS).

United States District Court, S.D. New York.

Aug. 6, 1998.

Weil, Gotshal & Manges LLP, New York City (Otto G. Obermaier, Brian S. Rosen, Eli Gottesdiener, Steven M. Shebar, Paul M. Tarr, Ross Morrison, of counsel), Bainbridge & Straus, Birmingham, AL (Michael Straus, of counsel), for Plaintiff.

Baker & Hostetler, Washington, DC (Mark A. Cymrot, Ralph G. Blasey, III, Ralph G. Blasey, III, Paul O. Gagnier, of counsel), for Defendants.

### OPINION

SWEET, District Judge.

Elliott Associates, L.P. ("Elliott") brought these actions to recover monies due and owing on foreign debt instruments it acquired by way of assignment in the secondary capital markets. Defendants The Republic of Peru ("Peru") and Banco de la Nacion ("Banco") (collectively, the "Peru Defendants") concede the validity of the debt but deny that Elliott is a valid holder. They contend that the assignments, by two third-party banks, are void because Elliott committed "champerty" in purchasing the debt in violation of Section 489 of the New York Judiciary Law. Banco additionally contends that it cannot be liable on the debt assigned to Elliott, even if the assignments are valid, due to an internal 1994 Peruvian law which purported to transfer Banco's foreign debt obligations to Peru, thus allegedly relieving Banco of any liability.

Upon the trial before the Court and all the prior proceedings and the findings of fact and conclusions of law which follow, judgment will be entered in favor of the Peru Defendants.

### Parties

Elliott is a Delaware limited partnership authorized to do business in the State of New York with its principal place of business in New York, New York.

Banco is a foreign financial institution organized under the laws of Peru with its principal place of business in Lima, Peru.

Peru is a foreign state as defined in 28 U.S.C. § 1603(a).

### Prior Proceedings

The prior proceedings in this controversy are set forth in the previous opinions of this Court, familiarity with which is assumed. See Elliott Assocs., L.P. v. Republic of Peru, 176 F.R.D. 93 (S.D.N.Y.1997); Elliott Associates, L.P. v. Republic of Peru, 96 Civ. 7916, 1997 WL 436493 (S.D.N.Y. Aug.1, 1997); Elliott Assocs., L.P. v. Republic of Peru, 961 F.Supp. 83 (S.D.N.Y.1997); Elliott Assocs., L.P. v. Republic of Peru, 948 F.Supp. 1203 (S.D.N.Y.1996). Elliott commenced these actions on October 18, 1996 in the Supreme Court of the State of New York, County of New York, seeking money judgments based upon allegations of Banco's default under certain written loan agreements and Peru's default under a written guaranty securing certain loan agreements. Peru and Banco removed these actions to this Court on October 21, 1996. The Court denied Elliott's

motion for an order of attachment on December 12, 1996 and for summary judgment on April 28, 1997. Some fourteen Orders and Opinions were entered relating to discovery and scheduling. A bench trial was held beginning on March 19, 1998, and ending on March 25, 1998. Post-trial submissions were received, and closing arguments were heard on May 26, 1998, at which time the action was considered fully submitted.

### Findings of Fact

#### I. *Elliott's Purchase of Peruvian Debt*

Elliott purchased, in a series of five trades from January 31, 1996, to March 1, 1996, all right, title and interest, from Swiss Bank Corporation ("SBC") and ING Bank, N.V. ("ING"), $20,682,699.04 in principal amount, together with all accrued and unpaid interest, of the working capital obligations [1] of Banco de la Nacion and Banco Popular del Peru under certain letter agreements (the "Letter Agreements"). The Letter Agreements were guaranteed by Peru in a written Guaranty on May 31, 1983 (the "Guaranty"). Elliott paid SBC and ING a combined total of $11,431,202.08.

The trades were as follows: (1) On January 31, 1996, $5,000,000 in principal amount was traded for $2,589,500.00 by SBC; (2) on February 6, 1996, $2,000,000 in principal amount was traded for $1,090,000 by ING; (3) on February 14, 1996, $5,000,000 in principal amount was traded for $3,250,000 by SBC; (4) on February 14, 1996, $5,000,000 in principal amount was traded for $2,589,500 by SBC; and (5) on March 1, 1996, $3,682,-679.55 in principal amount was traded for $1,907,259.83 by SBC.

Elliott closed its assignment agreement with ING on March 29, 1996, and provided a fully executed copy of the agreement to ING until April 15, 1996. Elliott closed its SBC purchases on April 19, 1996, and provided a

fully executed copy of the assignment agreement to SBC on May 1, 1996.

The Letter Agreements and the Guaranty, both of which are governed by New York law, are valid outstanding obligations of Banco and Peru. The Letter Agreements and the Guaranty entitle the holder to, among other things, repayment of all principal, plus interest as provided in the Letter Agreements. The Letter Agreements and the Guaranty also entitle the holder to recover attorneys' fees, costs and disbursements incurred to enforce the Letter Agreements and the Guaranty.

Of the total $20,682,699.04 in principal obligations Elliott acquired, Banco is the Obligor of $7,000,000 in principal. Banco Popular is the Obligor for the remaining $13,682,699.04 in principal. Peru, however, guaranteed to repay the entire amount.

Banco and Peru have not paid any of the outstanding amounts due and owing under the Letter Agreements or the Guaranty. Banco and Peru are therefore in default of their obligations under those instruments.

#### II. *Elliott's Intent And Purpose In Purchasing The Peruvian Debt Was To Bring An Action*

█ Elliott purchased the Peruvian debt with the intent and purpose to sue. This purpose and intent can be determined from Elliott's investment strategy, the resumes of the individuals assembled for the Peruvian debt project, Elliott's delay in closing the Peruvian debt trades until after litigation risks were clarified by the Second Circuit in the *Pravin Banker* matter, the absence of credibility to Elliott's alternatives, and Elliott's conduct subsequent to the purchases.

---

1. The working capital debt consists of direct loans between a single lender and a sovereignty entity, typically smaller in amount than syndicated debt, and typically documented simply by a letter agreement. Syndicated bank debt, by contrast, is debt syndicated by a lead bank which maintains books and records for all holders. Working capital debt is more cumbersome to trade than syndicated debt because, among other things, it does not have an agent bank, as does syndicated debt, which is responsible for maintaining the books and records of the ownership of the loan and the amounts outstanding. With working capital debt, there being no agent bank, the buyer essentially has to rely upon the seller to convey good title to a valid obligation which remains outstanding. For these reasons, working capital debt typically trades at a four to six percent discount from syndicated debt.

**A. Elliott's Emerging Market Debt Advisors Were Experienced In Purchasing Sovereign Debt And Suing Upon It**

Elliott set up an investment team for the purchase of emerging market debt, consisting principally of Jay Newman ("Newman"), Andrew Kurtz ("Kurtz"), a senior analyst and portfolio manager at Elliott, Paul Singer ("Singer"), Elliott's founder and chief executive, and Ralph Dellacamera ("Dellacamera"), Elliott's head trader. Additionally, the team retained Michael Straus as outside counsel.

Prior to its first meeting with Newman, Elliott had never invested in emerging market debt. Elliott is an investment fund which, at the time the sovereign debt team was assembled, specialized in the purchase of distressed assets which it believed the market had undervalued. These included debtor-companies in bankruptcy, companies recently emergent from bankruptcy, or companies which had yet to enter formal bankruptcy.

Singer, Kurtz and Dellacamera had no experience in emerging market debt. Elliott therefore relied on Newman's expertise and recommendations in purchasing emerging market debt.

Jay Newman, who had formerly practiced law, entered the sovereign debt investment area in 1983 during the Latin American debt crisis when he began working for Lehman Brothers. In 1987 or 1988, Newman became Lehman Brothers' managing director for Third World debt, responsible for developing Lehman Brothers' trading and investment business in that area.

In 1989, Newman joined Dillon Reed, where he continued trading and brokering emerging market debt and managed a third world debt investment fund. One year later, he moved to Morgan Stanley, again to work on emerging market debt investments.

In 1993, Newman left Morgan Stanley to establish The Percheron Fund, an offshore investment fund that focused on emerging market debt. Newman managed the Percheron Fund until 1995. Also in 1993, Newman solicited investors for Water Street Bank & Trust Limited ("Water Street"), another offshore fund that invested in emerging market debt. At approximately the same time, Newman introduced Water Street's investors to Michael Straus, who he had first met in 1992 or 1993, when Straus was representing Banque de Gestion Privee–SIB in its sovereign debt lawsuit against the Republic of Paraguay. Newman knew of Straus because of his work as trial counsel to clients involved in sovereign debt lawsuits, as Straus has been involved in at least thirteen other debt lawsuits against sovereigns in the United States.[2]

Straus assisted Newman in the solicitation of investors for Water Street and later became trial counsel to Water Street for its sovereign debt lawsuits.

Newman and Straus advised Water Street on its purchases of the sovereign debt of Poland, Ecuador, Ivory Coast, Panama, and Congo. Water Street thereafter filed lawsuits against each of those sovereigns seeking full payment of the debt purchased by Water Street. Straus served as trial counsel to Water Street for each of those lawsuits. Neither Newman nor Straus, however, made the ultimate decisions for Water Street regarding whether to purchase emerging market debt, or whether to sue the sovereign governments to collect. In May 1995, the Water Street investors decided to liquidate the fund, and Newman "assist[ed] extensively in [the] liquidation of Water Street."

Straus had become familiar with the elements of champerty. Allegations of champerty were charged against Straus' clients in *Banque de Gestion Privee–Sib v. La Republica de Paraguay*, 787 F.Supp. 53 (S.D.N.Y. 1992); *Water St. Bank & Trust Ltd. v. Republic of Congo*, 94 Civ. 1894(SS) (S.D.N.Y.); and *Water St. Bank & Trust Ltd. v. Republic of Poland*, 95 Civ. 0042(LAP) (S.D.N.Y.). In

---

**2.** Straus has recently invested directly in emerging market debt sued a sovereign on his own behalf. In 1996, Straus and Newman formed Red Mountain Finance Company ("Red Mountain"), an Alabama corporation which thereafter purchased sovereign debt of the Democratic Republic of Congo (former Republic of Zaire). In December 1997, Red Mountain filed a debt lawsuit in this Court against the Congo.

addition, Straus was familiar with *CIBC Bank and Trust Company (Cayman) Ltd. v. Banco Central Do Brasil,* 886 F.Supp. 1105 (S.D.N.Y.1995), where the defendant raised champerty.

## B. *Elliott's Emerging Market Debt Investments*

During the winding down of Water Street and Percheron, Newman "wanted to stay involved in the business of third world debt." Therefore, when he approached Elliott in August or September 1995, Newman "was looking basically for a relationship with an investment fund so that (he) could continue working in the area." By October 1995, Newman was retained as an advisor to Elliott and began to make recommendations on the purchase of emerging market debt in the secondary market.

According to Straus, in December 1995, Newman introduced him to Elliott for the purpose of retaining him for emerging market debt matters. Straus was retained by Elliott as counsel of record in this case and in Elliott's sovereign debt lawsuit against the Republic of Panama.

### 1. *The Panamanian Debt Purchases*

Newman first recommended that Elliott purchase the sovereign debt of the Republic of Panama, the same debt on which Water Street had brought suit.[3] At the time of Elliott's purchase of Panamanian debt, Panama was in the process of finalizing its debt restructuring. Newman and Singer were aware that Panama had announced the terms of its restructuring, and Newman advised Elliott as to the status of Panama's restructuring negotiations.

Elliott purchased $28,750,907.05 face value of Panamanian debt obligations for $17,579,-685.56 through trades with SBC, ING, First National Bank of Chicago, and Citibank, NK, and Newman negotiated the assignment agreements.

Elliott declined to participate in Panama's restructuring, and in July 1996, brought suit against Panama seeking full payment on the debt it had purchased. Straus was trial counsel for Elliott in that lawsuit.

### 2. *The Peruvian Debt Purchases*

Newman next recommended that Elliott purchase Peruvian sovereign debt. According to Singer, Newman was "instrumental in recommending" Peruvian debt to Elliott, "and that's why we bought the debt."

Like Panama, Peru was in the process of finalizing its restructuring when Elliott purchased its debt. In March 1983, Peru determined that it had insufficient foreign exchange reserves to service its foreign debt, and entered negotiations with the Bank Advisory Committee for Peru ("BAC"), a committee consisting of representatives of Peru's major commercial creditors.

The negotiations yielded a series of refinancing agreements, including letter agreements dated March 7, 1983, and May 31, 1983 (collectively the "1983 Letter Agreements"), between Peruvian banks and state-owned companies and their foreign creditors, and guaranteed by the Government of Peru.

After further negotiations stalled in 1984, Peru imposed restrictions on payment of external debt. As a result, Peru fell into arrears on its debts to various multinational organizations, foreign nations, and foreign commercial lenders.

On March 10, 1989, United States Treasury Secretary Nicholas Brady revised United States policy on international debt. The new policy, known as the "Brady Plan," urged lenders, on a voluntary basis, to forgive some of the debt owed to them by less developed countries, restructure what debt remained outstanding, and continue to provide these countries with additional loans.

Beginning in March 1990, Peru's commercial lenders filed various lawsuits in five countries. On October 25, 1990, Peru signed an agreement with the BAC to stay the pending lawsuits in order to enter into negotiations to restructure Peru's sovereign debt. About one year later, in September 1991, Peru and the IMF entered into an agreement to restructure the Peruvian economy.

---

**3.** The suit was subsequently dismissed due to Water Street's failure to comply with the Court's order to disclose its principals. *See Water Street Bank & Trust Ltd. v. Republic of Panama,* 94 Civ. 2609, 1995 WL 51160 (S.D.N.Y. Feb.8, 1995).

In 1993, Peru's sovereign debt was approximately $25 billion, which was owed to multinational institutions such as the IMF, the World Bank, and the Inter–American Development Bank; other countries; commercial banks; and suppliers.

In December 1994, all of the creditors who had sued Peru, with the exception of Pravin Banker Associates Ltd. ("Pravin Banker"), dismissed their lawsuits in consideration for Peru's November 1992 Tolling Declaration.

On October 27, 1995, Peru and the BAC publicly announced an agreement in principle for a debt restructuring plan designed in accordance with the Brady Plan. The agreement covered $4.4 billion face amount of debt, virtually all of the external commercial debt owed by Peru and Peruvian public and private-sector debtors, including the debt involved in these lawsuits. It was only after the agreement in principle was reached, in January 1996, that Elliott began to accumulate the debt at issue in this action.

The Term Sheet for Peru's restructuring was negotiated between January and June 1996 and was issued on June 5, 1996. Creditors were required to present commitments to participate in the restructuring by July 31, 1996. Of the approximately 180 creditors eligible to take part in Peru's restructuring, only Elliott and Pravin Banker refused to participate.

On November 8, 1996, Peru and its creditors executed an Exchange Agreement implementing Peru's restructuring ("Brady Agreement"), which closed on March 7, 1997.

### 3. *Elliott Intended To Bring An Action*

#### a. *From its inception in October 1995, Elliott's sovereign debt strategy focused on filing lawsuits*

As concisely put by Elliott's president, Paul Singer: "Peru would either . . . pay us in full or be sued." Under the circumstances as they existed in January 1996, when Elliott began its assembly of Peruvian debt, the only credible way that Elliott could achieve its goal of full payment was by bringing an action.

Singer, Elliott's president, admitted that demanding full payment and suing Peru was one of Elliott's investment strategies at the time it purchased Peruvian debt, although he claimed this alternative was , a last resort because of the typically poor investment return achieved through litigation, thus contradicting both Newman and Kurtz' testimony that filing suit or seeking full payment was not considered as a strategy.

#### b. *Newman and Straus have a long history of suing sovereigns*

Newman, upon whom Elliott relied in deciding to invest in the Peruvian debt, and Straus, with whom Elliott met in December 1995, before they began investing in the debt, are both experienced with the investment strategy of purchasing emerging market debt and suing thereon. Their involvement with Elliott is highly probative of Elliott's intent in purchasing the debt.

During Newman and Straus' association with Water Street, Water Street filed at least six debt lawsuits in this Court against sovereigns.[4] Straus also advised Water Street on its purchases of Ecuadorian, Panamanian, and Polish sovereign debt, and Water Street later filed lawsuits against each of those countries in London. In addition to being counsel of record to Elliott in this case, Straus has been involved as counsel in at least six other sovereign debt lawsuits against emerging market countries.[5] In December 1997, Straus' company, Red Moun-

---

4. *Water St. Bank & Trust Ltd. v. Republic of Ivory Coast,* 94 Civ. 2376 (S.D.N.Y.); *Water St. Bank & Trust Ltd. v. Republic of Congo,* 94 Civ. 1894(SS) (S.D.N.Y.); *Water St. Bank & Trust Ltd. v. Polish People's Republic,* 94 Civ. 2428(LAP) (S.D.N.Y.); *Water St. Bank & Trust Ltd. v. Republic of Poland,* 95 Civ. 0042(LAP) (S.D.N.Y.); *Water St. Bank & Trust Ltd. v. Republic of Panama,* 94 Civ. 2609(MGC) (S.D.N.Y.); and *Water St. Bank & Trust Ltd. v. Banco Central del Ecuador,* 95 Civ. 5253(JES) (S.D.N.Y.).

5. *Banque de Gestion Privee–SIB v. Republic of Paraguay,* 91 Civ. 7952(MBM) (S.D.N.Y.); *Weston Compagnie de Finance et D'Investissement, S.A. v. La Republica del Ecuador,* 93 Civ. 2698 (S.D.N.Y.); *LNC Investments, Inc. v. The Republic of Zaire,* 96 Civ. 5281 (S.D.N.Y.); *Elliott Associates, L.P. v. Republic of Panama,* 96 Civ. 5514(DC) (S.D.N.Y.); *Elliott Associates, L.P. v. The Republic of Panama,* No. 603615/96 (N.Y.Sup.Ct.); and *Allied Bank Int'l v. Banco Credito Agricola de Cartago,* 757 F.2d 516 (2d

tain Finance, brought suit against the Congo after purchasing that country's discounted sovereign debt on the secondary market.[6]

**c. *Elliott delayed closing its purchases of Peruvian debt until the Second Circuit had clarified the litigation risks***

Elliott intentionally delayed the closing of the assignments until after April 12, 1996, when the Second Circuit denied Peru's request for an order to stay enforcement of a judgment without requiring the defendants to post a bond for the amount of the judgment, thereby clarifying Elliott's litigation risks. *See Pravin Banker Associates Ltd. v. Banco Popular Del Peru,* Order No. 96–7183 (2d Cir. Apr. 12, 1996).

**1. *The Elliott–SBC Assignment Agreement***

The Elliott–SBC assignment agreement, covering four trades—January 31, February 13 (two separate trades), and March 1, 1996—is dated April 19, 1996. Ricardo Leiva, the SBC employee responsible for closing these trades, testified that he expected that the trade would close within the industry—standard 21 calendar or 15 business days.[7] Leiva testified that SBC's normal practice was to complete assignments within 15 business days even when subsequent trades occurred with the same counterparty during that 15 day period. The new trades would normally be added to the transaction and all purchases would close within 15 business days.

Elliott, however, rejected the Emerging Markets Traders Association ("EMTA") standard assignment agreement,[8] and instead requested that SBC use the same assignment agreement used for Elliott's earlier purchase of Panamanian debt from SBC.[9] Leiva re-

vised the earlier agreement to incorporate the terms of the Peruvian transaction and, on February 7, 1996, forwarded it to Elliott for execution.

Although Elliott had previously approved and executed the form of the assignment agreement in connection with its purchase of Panamanian debt, Elliott responded to SBC's draft on February 21, 1996 by requesting numerous changes and seeking additional documentation. Leiva testified that he was surprised at the level of changes to the assignment agreement proposed by Elliott.

On March 21, 1996, almost two months after its first trade with Elliott, SBC received additional revisions to the assignment agreement from Elliott, in which Elliott requested from SBC (a) a representation that the debt being purchased was still outstanding, (b) a representation that the Tolling Agreement and Guaranty were still in force, and (c) copies of the underlying loan agreements.

Elliott's lawyer informed SBC on March 21, 1996 that Elliott would not agree to a provision in the purchase of Peruvian debt requiring Elliott's consent to Peru's January 1994 privatization program, and sent additional changes to the assignment agreement on March 22, 1996.

On April 4, 1996, SBC sent Elliott a document labeled "final draft of assignment agreement," and enclosed copies of original letter agreements with Chase and Crocker Banks, some of the documentation demanded by Elliott.

On April 12, 1996, Mr. Leiva reported to Sarah Fels of the SBC legal department that a number of substantial issues were still out-

---

Cir.1985). With the exception of *Allied,* Straus represented the plaintiff in each of these cases.

**6.** Peru introduced other evidence purporting to show Elliott's intent and purpose to sue which the Court does not credit. For example, the Court does not credit the inference sought to be drawn by Peru that Elliott's due diligence with respect to the Peruvian debt assignments demonstrated an intent to sue. As Elliott contends, its conduct was consistent with prudent business practice to ensure that the debt purchased can be enforced.

**7.** The trade confirmation issued by SBC set 21 calendar days.

**8.** Generally, but not always, SBC used the EMTA standard form, which had been developed to simplify and standardize the closing process for sovereign debt transactions.

**9.** The Panamanian debt was syndicated debt whereas the Peruvian debt was working capital debt.

standing in connection with the Elliott transaction.

ING Bank received hard copies of the assignment agreement executed by an authorized representative of Elliott, Singer, on April 15, 1996, three days after the Second Circuit's decision in *Pravin Banker,* and approximately two and a half months after the trade date.

Shortly thereafter, on April 19, 1996, Elliott's purchase of Peruvian debt from SBC closed, although Newman did not forward to SBC executed hard copies of the assignment agreement for the Peru debt until May 1, 1996.

The SBC trades closed two months and nineteen days after the date of the first trade. Considering the standard practice of closing within 15 business days of a second trade, the assignments customarily would have closed by March 22, 1996. Rather, they closed approximately four weeks later.

Leiva estimated that the Elliott–SBC trade took longer to close than any of the approximately 300 sovereign debt trades he has been involved with during his three and a half years as a closer at SBC. Leiva also testified that he has never experienced the same level of problems in the sale of working capital debt as he encountered on the Elliott–SBC transaction.

## 2. *The ING Assignment Agreement*

On February 9, 1996, ING sent to Elliott a proposed assignment agreement, which was based on the assignment agreement previously executed by Elliott for its purchase of Panamanian debt from ING. Because that agreement had been acceptable to Elliott for its purchase of Panamanian debt, ING's closer for the transaction, Margaret Forehand, testified that she anticipated that it would be acceptable for Elliott's purchase of Peruvian debt.

Elliott responded to ING's draft assignment agreement on February 21, 1996, by sending to ING comments and changes to the proposed agreement. Before calling Newman and being told that Elliott's comments had been sent, Forehand had heard nothing for a week after forwarding the draft assignment agreement.

On March 1, 1996, Forehand forwarded a revised version of the ING assignment agreement incorporating Elliott's changes with a few slight modifications, which she expected that the transaction would be finalized at that time.

Elliott responded to ING's March 1, 1996, facsimile by requesting additional changes and insisting that ING provide the last date on which interest had been paid on the debt. Forehand testified that it was not customary in the market for a purchaser to require a last payment date.

ING's legal department drafted a letter sent to Elliott stating that the transaction had to close by a specific date or the deal would be canceled. In addition, the letter stated that Elliott had "unreasonably delayed settlement of the transaction and asked for certain provisions relating to the assignment of the assets that are not reflective of customary market practice and to which we cannot agree or comply." After being confronted with ING's ultimatum, Newman telephoned Forehand and said Elliott would close the ING transaction on March 29, 1996.

On March 28, 1996, Newman sent by facsimile executed signature pages of the assignment agreement to ING. They were signed by Dellacamera, purportedly on behalf of Elliott. However, Dellacamera was not authorized to bind Elliott to the ING assignment agreement. In general, he had no authority to sign contracts on behalf of Elliott. Dellacamera was only authorized if Singer had executed a specific written authorization. No written authorization was executed for Dellacamera with respect to the ING agreement. Elliott admitted that it sent the signed agreement only after being threatened by ING with cancellation of the transaction. The following day, March 29, 1996, Elliott wired ING its payment.

Forehand testified she knew of no reason why the transaction with Elliott could not have closed within the standard 21 calendar day period. In fact, because Elliott failed to close promptly, ING imposed financial penalties on Elliott. Forehand testified that she

has handled hundreds of sovereign debt transactions for ING, and that the level of changes to the ING agreement requested by Elliott was not customary.

### 3. Elliott Failed To Explain Any Alternative Reason For The Delays

Even though Newman was responsible for negotiating the assignment agreement with SBC on behalf of Elliott, he testified at his deposition that he did not know why the transaction took from January 31, 1996 to April 19, 1996 to close. At trial, however, Newman proffered a list of purported reasons for the delay. First, Newman blamed SBC, claiming there was "a lot of back and forth ... over their representation" as to the amount of accrued interest, a "language problem" between Elliott's attorney and the SBC closer, and a failure by SBC to supply underlying documentation of the debt.

Newman also cited the concern of Elliott's attorney, Larry Hui, about "dotting every 'i' and crossing every 't' because these were direct loans" rather than syndicated loans. Newman asserted that Elliott's practice was to be "obsessive" about the "necessity and accuracy of documentation in connection with purchases involving its investments." He further claimed that "[t]he policy of the house is to be very, very careful and thorough," and that Elliott's lawyers were "under those instructions" in connection with the SBC and ING purchases.

Finally, Newman claimed the closing delay occurred because Elliott had made "six or eight different purchases" and wanted to "wrap all these up into a single document" rather than enter into "six or eight different assignment agreements."

Elliott made five trades for the Peruvian debt, the last of which was concluded on March 1, 1996. The complexity of the assignments for working capital debt does not explain why the agreements did not close until six weeks later on April 15, 1996. The timing of the closings to occur after the Second Circuit's April 12, 1996, denial of Peru's stay application is more than mere coincidence, and evinces a deliberate strategy to maintain the option of unwinding the trades if the litigation risks seemed too great.

### B. Elliott Did Not seriously consider Alternatives To Bringing An Action

Elliott at trial advanced various alternatives to bringing an action in an effort to recharacterize its intent at the time Elliott decided to purchase the Peruvian debt. They included:

(1) holding and reselling the debt.

(2) participating in Peru's privatization program;

(3) participating in Peru's restructuring, including negotiating to improve the terms of the restructuring for all of Peru's creditors; and

(4) negotiating separately with Peru to obtain a better deal than the Brady terms.

The evidence adduced at trial, however, clearly and convincingly demonstrated that none of these alternatives was realistically considered by Elliott when it purchased Peruvian debt. From the start, Elliott intended to sue and the testimony to the contrary was not credible.

### 1. Elliott Did Not Plan to Hold And Resell Peruvian Debt

Newman, Kurtz, and Singer all testified that one of Elliott's investment strategies was to hold and resell its Peruvian debt. Singer claimed that this strategy was Elliott's "first resort." The evidence presented at trial, however, demonstrates that Elliott never intended to resell its Peruvian debt.

Singer admitted that Elliott never attempted to resell the Peruvian debt it purchased from SBC and ING. Although before Elliott brought this action SBC offered to repurchase the debt from Elliott at a "mutually acceptable price," Elliott rejected SBC's proposal without discussing a price. Singer stated bluntly that reselling the debt to SBC "wasn't an option, and I didn't even know at that time what a mutually acceptable price was." SBC repeated its offer twice, and each time Elliott refused to resell the debt.

Similarly, on May 30, 1996, ING offered to assign Elliott's interest in the debt purchased from it to a purchaser of Elliott's choice so that Elliott would obtain the economic benefit of its purchase of Peruvian debt. On May 31, 1996, Newman rejected ING's offer. Newman admitted that Elliott never even investigated potential purchasers.

Indeed, Elliott's only offer to sell its Peru debt (at the full amount of principal and interest) was in November 1996, after Elliott had filed suit against Peru.

### 2. *Elliott Did Not Plan To Invest In Peru's Privatization Program*

Another of Elliott's claimed "investment strategies" was to participate in Peru's privatization program. However, Elliott could not have achieved its full payment goal thereby, and was unfamiliar with the privatization program.

Elliott's primary goal in investing in Peruvian debt was to be paid in full: "Peru would either . . . pay us in full or be sued." Under Peru's privatization program, however, only the principal amount of contributed debt was valued and a potential buyer was required to relinquish its claim to receive interest on that principal amount. Accordingly, full payment, including interest, was not possible through participation in a privatization.

Moreover, Elliott's testimony that Peru would negotiate a private debt-for-equity swap was not credible and misinformed. Newman testified that "if you had interest in buying Peruvian companies, you could approach Peru to talk about the purchase price on a negotiated basis, and negotiate also how you would pay. And part of the payment could be in terms of debt." Newman claimed that privatization projects were undertaken "mostly on a negotiated basis" rather than by competitive bid because Peru had "guidelines and ranges" that allowed it flexibility in valuing debt contributed to a privatization.

However, Newman could not identify a single instance in which Peru negotiated with a creditor over the value of debt contributed in a privatization transaction. Furthermore, Newman could not explain how the bidding process worked. Nor did he know that all

privatized properties were sold by open bid. Indeed, Newman admitted that he never researched the procedures used by Peru in implementing its privatization program.

Dr. Jorge Peschiera ("Peschiera"), Peru's Chief Debt Negotiator from 1993 to 1997, credibly described the privatization process. To implement the privatization program, the Peruvian government established a ministerial committee to oversee privatization and to determine which companies to privatize. Thereafter, a special committee was established for each company that would be privatized. The special committee solicited bids to choose an investment bank to act as an advisor to the special committee. The terms of the bidding were publicly known and the bids were opened publicly. The majority of the successful bidders were large international institutions. Following the selection of an investment bank, the special committee and the investment bank would determine the best way to proceed and a privatization plan would be prepared. Included in the plan were the criteria for submitting bids—for example, minimum capital requirements, commitment to build infrastructure, experience in the relevant industry. These criteria were established in advance of soliciting any bids and were publicly announced.

Accordingly, contrary to Newman's unsupported claim that Peru would negotiate separately with creditors as concerned privatization projects, Peschiera testified that Peru publicly solicited bids from eligible bidders, opened the bids publicly, and selected the best bid. Peschiera testified that there were no private negotiations between Peru and potential buyers over either the participation criteria or with successful bidders.

### 3. *Elliott Did Not Intend To Participate In Peru's Brady Plan*

Newman, Kurtz, and Singer contended that participation in Peru's restructuring was one of Elliott's investment strategies. However, Elliott knew the terms of Peru's restructuring before it purchased Peruvian debt, and Elliott rejected opportunities to participate in Peru's restructuring.

Elliott was aware at the time it purchased the Peruvian debt that Peru had announced

the terms of its restructuring agreement. Both Singer and Newman testified that Elliott had calculated the "sizable discount" from face value being offered by Peru under the terms of its restructuring. At his deposition, Singer testified that this calculation had been made "[a]s soon as [Elliott] learned of the possibility of purchasing Peruvian debt" and the Brady terms. Elliott was also aware of the Peru bank advisory committee negotiations prior to Elliott's purchase of Peruvian debt.

Even before purchasing Peruvian debt, Elliott had concluded that it was going to claim that the terms of Peru's restructuring undervalued Peruvian debt. Newman testified that he "was skeptical of the terms of the Brady."

Indeed, Elliott rejected each and every opportunity to participate in Peru's restructuring. Newman conceded that Elliott was given the opportunity to submit a commitment to Peru's restructuring but refused to do so, and Singer admitted that Elliott never even attempted to participate in Peru's restructuring.

### 4. Elliott Did Not Plan To Negotiate Separately With Peru

Finally, Elliott witnesses claimed that another investment strategy was to negotiate separately with Peru outside Peru's negotiations with the BAC. The purported basis for Elliott's conclusion that this strategy was viable, however, lacks credibility.

#### a. Elliott knew Peru's incentives to not engage in separate negotiations

Because of the BAC's insistence that all creditors be treated equally, Peru publicly announced that it would negotiate the terms of its debt restructuring only with the BAC and that it would not conduct separate negotiations with individual creditors. As part of Elliott's due diligence in purchasing Peruvian debt, Kurtz read the *Pravin Banker* decisions, including the Court's August 24, 1995 decision. In that decision, the Court commented that "Defendants note that Peru has committed to the Bank Advisory Committee not to give creditors who filed suit an advan-

tage over creditors abiding by the Tolling Declaration."

At trial Newman admitted that he knew that countries in the process of negotiating restructurings of their sovereign debt with bank advisory committees resist separate negotiations with individual creditors. As relates specifically to Peru, Newman testified at trial that he was aware before Elliott's purchase of Peruvian debt that Peru had resisted separate negotiations with creditors in connection with the *Pravin Banker* and *Banco Cafetero* lawsuits.

#### b. Elliott's claim that Peru would negotiate separately is unsupported

As grounds for his claim that Elliott believed that Peru would negotiate separately with Elliott, Newman asserted that "Peru is probably the most opportunistic debtor ... of all the sovereigns I have seen." As support for this allegation, Newman cited several points: (1) the conduct of the Garcia administration; (2) the fact that Peru stopped paying interest on working capital loans at different times; (3) the Banco de la Nacion buyback program; (3) Peru's privatization program; (4) Peru's settlement of a claim brought by AIG; and (5) alleged side deals made by Peru. In sum, Elliott contended that Peru's "opportunistic" conduct led Elliott to believe that Peru would engage in separate negotiations.

##### 1) Different Default Dates For Different Creditors

Newman asserted that Peru's opportunistic character could be discerned from the observation that when Peru began defaulting on working capital debt in 1988, it did not default on all working capital loans at the same time. Instead, he asserted, Peru defaulted on the debt selectively over a five year period from 1988 through 1992.

Peschiera testified, however, that the default dates for working capital debt were not based on selective treatment of creditors. Instead, the dates were determined by when the private borrowers who were the ultimate recipients of the monies stopped making payments to the Peruvian state-owned banks who had borrowed and re-lent the

funds. Because the private borrowers began having financial difficulties and went into bankruptcy at different times, the corresponding default dates also varied. In addition, Peschiera explained that the state banks themselves, such as Banco Popular, went into bankruptcy at different times.

### 2) *The Buyback Program*

Newman also pointed to Banco's buyback program as evidence that Peru treated creditors differently, and therefore their hope for a separate negotiated settlement with Peru was realistic.

Evidence adduced at trial established that beginning in approximately July 1994, and continuing until around the time Peru concluded its Brady negotiations, Banco set up a program to purchase Peruvian sovereign debt on the secondary market (the "Buyback Program"). The Buyback Program was undertaken under the authority of Banco, although members of the Peruvian government were advised of and approved the program.

To execute purchases, Banco issued guidelines to SBC as to the type and amount of debt to purchase and the maximum purchase price. Upon receiving Banco's instructions, SBC solicited sellers in the secondary market within the confines of those instructions. Any holder of Peruvian debt could sell that debt to SBC within the confines of Banco's instructions. Peschiera testified that Banco never gave instructions regarding from whom SBC should purchase Peruvian debt and, to his knowledge, SBC never distinguished among sellers.

Peru bought back at a substantial discount $1.735 billion in face value of principal, which was approximately 41% of the total $4.2 billion in face value then outstanding. The

total value of the debt Peru repurchased, in principal amount plus accrued interest, was $3.5 billion. The Buyback Program was conducted confidentially, and thus it did not identify itself to any of the sellers.[10]

Although the Buyback Program may establish that Peru was able to exploit favorable market conditions to repurchase its own debt at a discount from the face value, it provides no evidence of the type of individual treatment Elliott contends it sought.

### 3) *Privatization Program*

Newman also cited Peru's privatization program as an example of Peru's disparate treatment of creditors, claiming that serious investors could "propose the type of debt they would use and the price at which it was redeemed." Newman asserted that starting in 1993, "Peru negotiated separately with many, many, many holders of Peruvian debt, particularly holders of working capital, to basically implement debt equity conversions, pursuant to which the debt was converted into equity investments in Peruvian companies."

However, Newman admitted that he never investigated the terms and procedures for participating in Peru's privatization program. Newman did not know, for example, that under the program all of the properties were sold by open bid. Peschiera testified that both the terms of the bidding process and the results were publicly announced. Peschiera testified that, to his knowledge, there were no separate negotiations between Peru and potential purchasers.

Newman also did not known that Peruvian law provided a formula as to how debt would be valued when offered under the privatiza-

**10.** Elliott also contends that the Buyback Program resulted in an undervaluation of Peru's debt in the Brady plan. However, Peschiera testified that he was aware that Jorge Camet, Peru's Minister of Economy and Finance, informed IMF officials of the Buyback Program at its inception. Moreover, as early as July 1995, representatives of the BAC informed Peru that SBC was purchasing large amounts of Peruvian debt and that they suspected that Peru was behind the purchases.

By early 1996, the Buyback Program was widely reported in the financial press, including the amount purchased and the cost of the pro-

gram, and was known to Elliott. Peschiera testified that Peru and the BAC in fact took account of amounts purchased pursuant to the Buyback Program in calculating the discount that was applied to Peruvian debt under the restructuring plan. In other words, the terms of the restructuring took account of the Buyback Program and valued Peruvian debt accordingly. Indeed, Elliott was aware of press reports by 1995 that Peru or some entity in Peru was repurchasing Peruvian debt. Elliott's attorney even referenced the repurchase program during the debt purchase negotiations with SBC.

tion program. Peschiera testified that Peru enacted legislation in 1993 that specified how debt could be used in the privatization process "to try to give everybody a chance, the same chance."

### 4) *American International Group Negotiation*

Newman further testified that "friends of mine at AIG ... said that they had success in direct negotiations with Peru because AIG was owed money by Peru." Peschiera explained, however, that the AIG agreement with Peru resolved a claim arising from the Garcia Government's expropriation of an oil company, having nothing to do with sovereign debt.

### 5) *Side Deals*

In a further attempt to support Elliott's claim that separate negotiations with Peru was a viable option, Singer asserted that Elliott knew of numerous "side deals" in which Peru had favored one creditor over another. Under questioning from the Court, however, Singer was unable to identify a single instance in which Peru negotiated separately with any creditor.

THE COURT: [C]an you tell me when you first learned of any of what you characterized as opportunistic transactions, and can you identify any such?

SINGER: I can't identify any such, and I believe—well, in the sense that not paying one class of debt and ceasing to pay—

THE COURT: That I understand.

SINGER: Right.

THE COURT: That's a matter of record, one presumes. But this business of the privatization and private deal and so on, you don't know of any specific one—

SINGER: No.

THE COURT:—nor at this point can you tell me when you first heard that, can you?

SINGER: That's correct.

### C. *Elliott's Negotiations With Peru After Its Purchases Were A Pretext*

Elliott adduced evidence at the trial that it wrote several demand letters to Peru and attempted to open negotiations with Peru to resolve the dispute without litigation. These steps, however, were pretextual and never demonstrated a good faith negotiating position.

The evidence adduced at trial established that on May 1, 1996, following the execution of each of the two assignment agreements, Elliott sent joint notices of the assignments to Peru's reconciliation agent, Morgan Guaranty, to register its debt in order to obtain Elliott's pro rata share of the partial interest payments Peru was preparing to make in connection with its proposed Brady restructuring, and to become eligible to participate in the restructuring itself.

On May 2, 1996, Elliott sent a letter, signed by Newman, to Banco, Banco Popular del Peru, and the Republic of Peru informing them that Elliott was now one of their creditors and that Elliott wished to initiate discussions regarding repayment. Newman also spoke by telephone on May 17, 1996, with Mark Cymrot, counsel for Peru, who had responded to Elliott's May 2nd letter in a letter dated May 9, 1996. Michael Straus, who had by this time been advising Elliott with respect to its Peruvian investments, and Andrew Kurtz were also on the call for Elliott.

Shortly thereafter, Elliott received letters from Peru's Director General of Public Credit of the Ministry of Finance and Economy, addressed to Elliott, Swiss Bank, ING and Morgan Guaranty, dated May 17, 1996, stating that Peru refused to recognize Elliott as a lawful creditor on the grounds that it was not a "financial institution" within the meaning of the 1983 Letter Agreements.

Elliott also learned, shortly after receiving these letters, that Peru was otherwise interfering with Elliott's rights as a creditor, for example, by attempting to reverse Morgan Guaranty's partial reconciliation of Elliott's debt and prevent Morgan Guaranty from sending Elliott the partial interest payments to which Elliott was entitled under the 1983 Letter Agreements.

On May 21, 1996, Elliott again wrote Banco, Banco Popular del Peru and the Peru purportedly to open a dialogue. On June 19, 1996, Elliott informed Peru, through its counsel, that the position it had taken was unjust-

ified and commercially unreasonable and had the affect of interfering with processing of interest payments Elliott was due. On June 25, 1996, Paul Singer wrote Peru demanding that it "cure its defaults."

On July 11, 1996, counsel for Elliott again reiterated to Peru, through counsel, that Peru had no role in the assignment process, no right to veto Elliott as a legitimate assignee and creditor, and no right to interfere with Elliott's rights to the interest payments it was due.

Finally, in September 1996, Elliott initiated a meeting with the Defendants, which was unproductive. Shortly thereafter Elliott filed the instant action.

Elliott contends that a series of letters they sent, and discussions they initiated, demonstrate an intent to negotiate a settlement of the debt without bringing an action. None of the evidence introduced, however, demonstrates a negotiating position short of demanding full payment—a position Elliott must have known Peru would reject under the circumstances of its negotiation of the Brady plan restructuring with the BAC.

In sum, (1) Elliott's admission that their investment strategy was to be paid in full or sue, Kurtz and Newman's contrary testimony notwithstanding, equated to an intent to sue because they knew Peru would not, under the circumstances, pay in full; (2) Elliott hired Newman and Straus to guide their investments in Peruvian debt, both of whom had recent experience suing Sovereigns; and (3) Elliott delayed the closing of its Peruvian debt trades until after the Second Circuit denied Peru's motion for a stay pending appeal in the *Pravin Banker* litigation; (4) Elliott's purported alternative investment strategies either were not seriously considered prior to deciding to purchase the debt, or were not reasonable given its profit expectations; and (5) Elliott's overtures to Peru to settle the dispute short of litigation were a pretext.

### III. *Peru's Supervening Decree Replacing the Bank as Obligor*

Banco is an autonomous financial institution that is a Peruvian state enterprise. Banco is governed by its own internal policies and Board of Directors that makes business decisions independent of the government.

The primary functions of Banco are to manage the public treasury, to centralize the collection of taxes and to act as a financial agent for Peru. None of these functions is reserved to Banco, but can be carried out by any Peruvian banking institution. For example, the collection of taxes is carried out by other Peruvian banks.

Banco prepares a yearly budget. Banco does not receive any operating funds from Peru.

Like any Peruvian financial institution, Banco is subject to the supervisory authority of the Superintendencia de Banca y Seguros, which ensures that any banking functions of Banco are carried out in accordance with Peruvian laws and regulations governing the banking industry. Banco is subject to the same supervisory authority as other Peruvian financial institutions.

Banco is obligated to comply with Peruvian laws and banking regulations. Failure to do so could result in the imposition of sanctions against the bank and its employees.

Banco receives deposits from governmental entities such as the central government and state-owned companies, as well as from public employees. However, these entities are under no obligation to deposit their funds with Banco. Moreover, once deposited with Banco, the bank can use those monies as it sees fit subject to the depositors' right to withdraw their funds.

Banco also lends money to entities of the central government and municipal and provincial governments. Those entities are required to re-pay any money lent to them.

Pursuant to Supreme Decree 112–86–EF, Banco and the Peruvian Ministry of Economy and Finance entered into a loan agreement through which Peru formally recognized its obligations as guarantor of certain loans previously made by Banco to state-owned entities with funds obtained from foreign banks. Those loans consisted primarily of short-term working capital loans such as the debt at issue in this case.

In April 1994, Peru issued Urgent Decree 09–94. This decree purported to replace Banco as the debtor on the underlying loans that were the subject of Supreme Decree 112 and substitute the Ministry of Economy and Finance as the obligor.

## CONCLUSIONS OF LAW

### I. Peru and Banco Have Breached Their Contracts

### A. Banco Is Liable Under the Contract

■ Under New York law, to establish a breach of contract a plaintiff must plead and prove the following elements: (i) proof of the existence of the contract; (ii) breach by the other party; and (iii) damages suffered as a result of the breach. *See Furia v. Furia,* 116 A.D.2d 694, 695, 498 N.Y.S.2d 12, 13 (2d Dep't 1986). Failure to tender payment pursuant to a contract is a material breach. *ARP Films, Inc. v. Marvel Entertainment Group, Inc.,* 952 F.2d 643, 649 (2d Cir.1991). Therefore, where a contract unambiguously requires the defendant to make payments pursuant to its terms, and the defendant fails to make said payments, judgment must issue in favor of the plaintiff. *See Daiichi Seihan USA v. Infinity USA, Inc.,* 214 A.D.2d 487, 488, 625 N.Y.S.2d 527, 528 (1st Dep't 1995). These principles are routinely applied in favor of creditors suing foreign states on defaulted loan agreements. *See, e.g., Allied Bank Int'l v. Banco Credito Agricola de Cartago,* 757 F.2d 516 (2d Cir.1985); *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru,* 109 F.3d 850 (2d Cir.1997).

■ Here, it is undisputed that (1) Banco borrowed $7,000,000 in principal, and owes interest thereon, pursuant to the Letter Agreements; (2) Elliott is the assignee of various banks' interests in and to these amounts owed by Banco under the Letter Agreements; (3) Banco has failed to pay to Elliott the amounts due and owing to it under the Letter Agreements and has therefore breached the Letter Agreements; and (4) Elliott has suffered damages in excess of $7,000,000 as a result thereof.

Because Banco has not disputed the basic facts with respect to its failure to pay these debts, Banco has breached the Letter Agreements.

### B. Peru Is Liable Under the Guaranty

■ To recover under a guaranty, a plaintiff must establish the existence of the loan, the unconditional guaranty, and the guarantor's failure to pay in accordance with the guaranty's terms. *Bank Leumi Trust Co. v. Rattet & Liebman,* 182 A.D.2d 541, 542, 582 N.Y.S.2d 707, 708 (1st Dep't 1992); *First Interstate Credit Alliance, Inc. v. Sokol,* 179 A.D.2d 583, 584, 579 N.Y.S.2d 653, 654 (1st Dep't 1992).

■ Here, it is undisputed that (1) there remains outstanding $20,682,699.04 in principal, plus interest, borrowed under the Letter Agreements; (2) in the Guaranty, Peru guaranteed repayment to the various original lenders or their assignees of any such amounts due and owing under the Letter Agreements; (3) Elliott is the assignee of various lenders' interests in and to the Letter Agreements; (4) the original borrowers are in default and Peru has failed to pay to Elliott the amounts due and owing under the Letter Agreements and has therefore breached the Guaranty; and (5) Elliott has suffered damages in excess of $20,682,699.04 as a result thereof.

Because Peru has not disputed the basic facts with respect to its failure to pay these debts under the Guaranty, Peru has breached the Guaranty Agreement.

### II. Elliott Has Violated Section 489 of the New York Judiciary Law

■ The Peru Defendants contend that, although the debt is valid and the agreement has been breached, Elliott's claim must be dismissed because the assignments violate New York Judicial Law § 489, which makes unlawful the purchase of debt "with the intent and for the purpose of bringing an action or proceeding thereon." Elliott, on the other hand, contends that as a factual matter it did not purchase the debt with the requisite "intent and purpose," and as a legal matter the statute does not sweep as far as to render unenforceable their claim against Peru.

Elliott's position is strong as a matter of policy in the world of commerce. Peru borrowed billions of dollars from commercial banks in exchange for the obligation to repay the principal with interest. Peru spent the borrowed funds, and now refuses to repay an assignee of the debt. Failure to enforce a bargain between sophisticated parties such as Peru and their lenders would, according to Elliott, undermine reasonable expectations about contract law, the *terra firma* upon which contemporary business transactions are based. Moreover, restrictions on the rights of commercial lenders to assign the debt were not negotiated for by Peru, and imposing some restriction here seems at odds with the strong policy in favor of the free alienability of property. Cast in this light, § 489 seems to fit uncomfortably with current sensibilities—a relic of Medieval English legal concerns about the perversion of judicial process given effect by the common law doctrine of champerty.

 Yet, the Court's role here is not to make policy assessments—to rank its preferences among contract, property, and champerty doctrines. Instead, a statute enacted by the New York State legislature must be interpreted in the light of its text, history, and precedent. As a statutory creation, § 489—re-enacted by the New York legislature as recently as 1965—must be understood on its own terms, whatever its roots. Although Elliott suggests several theories by which the statute should be limited to exclude the instant transaction, the theories fail for lack of support in the text, history, and relevant precedent.

 At the outset, the findings above establish that the Peru Defendants proved by clear and convincing evidence that Elliott purchased the debt with the intent to sue thereon.[11] Clear and convincing evidence has been defined as that quantum of proof which "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the [factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 285 n. 11, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (citation omitted). *Accord Reed v. State,* 133 A.D.2d 107, 111, 518 N.Y.S.2d 645, 648 (2d Dep't 1987), *rev'd on other grounds,* 78 N.Y.2d 1, 574 N.E.2d 433, 571 N.Y.S.2d 195 (1991). The Peru Defendants have met this standard.

 The intent to sue, however, is not sufficient to violate § 489, which requires that the debt be purchased "with the intent *and for the purpose of bringing an action* or proceeding thereon." N.Y.Jud. Law § 489 (emphasis added). As the Court of Appeals emphasized in *Moses v. McDivitt,* 88 N.Y. 62 (1882), "[t]his language is significant and indicates that a mere intent to bring a suit on a claim purchased does not constitute the offense; the purchase must be made for the very purpose of bringing such suit, and this implies an exclusion of any other purpose." *Id.* at 65. *See also Fairchild Hiller Corp. v. McDonnell Douglas Corp.,* 28 N.Y.2d 325, 329, 270 N.E.2d 691, 693, 321 N.Y.S.2d 857, 860 (1971) (same).

Yet in the cases where courts find a § 489 violation, the assignee had a purpose other than to bring an action—*e.g.,* to gain royalty-free use of patented technology, *see Refac Int'l. Ltd. v. Lotus Dev. Corp.,* 131 F.R.D. 56, 57 (S.D.N.Y.1990) (Mukasey, J.). Moreover, the Court of Appeals has noted that the statute would be violated, for example, if the "purpose" of the assignment was to "obtain costs," *see Moses,* 88 N.Y. at 65, or to "oppress" debtors, *see Wetmore v. Hegeman,* 88 N.Y. 69, 73 (1882). Accordingly, the significance of the requirement that the assignee have "the purpose of bringing an action" must be gleaned from text of the statute, as well as its precedent and history.

New York Court of Appeals precedent provides little guidance for construing the statute's proper scope. The Court of Appeals has confronted the issue of the meaning of the statutory phrase "purpose of bringing an

---

11. The parties dispute whether the proper standard of proof is a preponderance or clear and convincing. Since the Peru Defendants have established intent clearly and convincingly, the Court need not reach this issue.

action" twice. The first occasion was in the case of *Moses v. McDivitt*, 88 N.Y. 62 (1882), where the court reviewed for error a jury instruction for a predecessor of § 489. The judge instructed the jury that "if [Moses'] intention in buying [the bond] was to use it to compel [McDivitt] to do a particular thing, as to assign stock for instance, and if he would not comply with his wishes to sue it, that would be a violation of the statute." *Id.* at 67. The facts adduced at trial tended to establish that Moses had paid $2,000 to purchase a $2,500 bond and mortgage for the purpose of inducing or coercing McDivitt, as a condition of extending the time of payment, to assign to him certain stock in a publishing company in which he was interested in order to control an election of directors of the company. The court held that this purpose, "whether honest or reprehensible, was not within the prohibition of the statute." *Id.* at 67. The intent to coerce did not amount to an intent to sue, which "was to be resorted to only for the protection of [Moses' rights] in case the primary purpose of the purchase should be frustrated." *Id.* at 67–68. Accordingly, the court remanded the case for a new trial.

The *Moses* court held that a purchase of bonds by an attorney is not "made illegal by the existence of the intent on his part at the time of the purchase, which must always exist in the case of such purchases, to bring suit upon them if necessary for their collection. To constitute the offense the primary purpose of the purchase must be to enable him to bring a suit, and the intent to bring a suit must not be merely incidental and contingent." *Id.* at 65 (emphasis added).

Here, however, Elliott intended to collect 100% of the debt not by negotiating, participating in a debt-for-equity swap, trading, or going along with the Brady plan, but rather by suing. Unlike *Moses*, the intent Peru established was the intent to sue, and that intent was not contingent or incidental.

The Court of Appeals again addressed the prohibited purpose almost 100 years later in *Fairchild Hiller Corp. v. McDonnell Douglas Corp.*, 28 N.Y.2d 325, 329, 270 N.E.2d 691, 693, 321 N.Y.S.2d 857, 860 (1971). In *Fairchild*, the plaintiff acquired the operating assets of an aircraft manufacturer, Republic Aviation Corporation ("Republic"). One component of the operating assets was Republic's outstanding contracts and any related claims. Pursuant to this agreement, plaintiff acquired a claim against the defendant. After two years of unsuccessful negotiations, plaintiff brought an action against defendant, and defendant moved for summary judgment on the grounds that the assignment violated § 489. The court denied defendant's summary judgment motion because "[t]he acquisition of the claim was simply an incidental part of a substantial commercial transaction...." *Id.* at 330, 270 N.E.2d at 693, 321 N.Y.S.2d at 860–61. The facts in *Fairchild*, therefore, are easily distinguished from the instant case, where Elliott's assignments were not an incidental part of a major corporate acquisition, and Elliott did not engage in two years of negotiations.

Indeed most of the courts interpreting § 489 have decided the case by finding that intent to sue was merely contingent or incidental, and not primary. Therefore, few cases have addressed the legal issue of whether the type of assignment of debt here is within the scope of the statute. In *Elliott Assocs. v. Republic of Panama*, 975 F.Supp. 332 (1997), another case brought by Elliott suing on sovereign debt, the Honorable Denny Chin granted summary judgment to Elliott and rejected Panama's § 489 defense. The court, however, assumed that Elliott had "the intent to sue *if* necessary to collect on the loans," *id.* at 340 (emphasis added), but concluded that on the record presented Elliott had possibilities other than litigation, including trading and direct negotiation with Panama. *Id.* at 340–41. Accordingly, the court held that the facts adduced by Panama did not raise a genuine issue of material fact regarding Elliott's contention that its intent to sue when it purchased the debt was merely contingent. The court did not hold that if the intent to sue was found, that the statute would not apply to the type of transaction at issue—an assignment among sophisticated parties of all right, title and interest in sovereign debt.

Similarly, in *Banque de Gestion Privee–Sib v. La Republica de Paraguay,* 787 F.Supp. 53 (S.D.N.Y.1992), the Honorable Michael B. Mukasey granted summary judgment to the plaintiff on its claim that Paraguay breached its contract to pay on its debt, and rejected Paraguay's § 489 defense. The court held that plaintiff had not formed the intent to sue prior to the debt assignment, and that the intent to sue was merely incidental and contingent. *Id.* at 56–58 (quoting *Moses,* 88 N.Y. at 65). Accordingly, neither *Panama* nor *Banque de Gestion Privee–Sib* decided that, if an intent that was not contingent or incidental was found, that § 489 would not apply.

Elliott also cites *Drake v. Northwest Natural Gas Co.,* 165 A.2d 452 (Del.Ch.1960). In *Drake,* a New York lawyer purchased defaulted corporate debt at a deep discount at an auction and promptly turned the notes over to his brother-in-law, another attorney, who in turn promptly wrote the following letter to the company:

> A client of mine has acquired and now owns notes made by you in the sum of about $209,000 to Morgan, Stanley & Co. I am under instructions to proceed to enforce payment of the said notes. Before doing so, I should be pleased to sit down to discuss the matter with you at our mutual convenience.

165 A.2d at 453. Suit followed, the company went into liquidation, and the claim was objected to on the grounds that the letter "clearly establishes claimant's intent and purpose at the time of his purchase to have been to bring suit on such notes in violation of [the statute]." *Id.*

Although the Delaware court cites Moses and Baldwin for the proposition that the statute "was enacted for the purpose of controlling a form of common law champerty, namely the 'stirring up' of litigation by attorneys through the purchase of choses in action for the very purpose of suing thereon and collecting costs," *id.* at 454–55, the court reaches the factual conclusion that "[the lawyer's] demands for payment coupled with threats up to the time of bringing suit disclose the normal tactics of a lawyer seeking to realize on a client's claim . . . ." *Id.* Accord-

ingly, while the court found an intent to sue if the demands were not met, they relied on the finding that bona fide attempts to resolve the matter without litigation were made.

The primary cases cited by either party where violations of § 489 have been upheld involve assignments where the assignment contract would be breached if the contracting party did not institute litigation. For example, in *Refac,* the plaintiff took an assignment of a patent under a contract that expressly required the assignee "to sue alleged patent infringers on behalf" of the assignor, who retained a 95% interest in the patent. *Refac,* 131 F.R.D. at 57. Indeed, it would have been a "material breach" of the assignment agreement if suit was not brought within 20 days of the assignment. *Id.* Accordingly, the assignment was clearly made in order "to enable [plaintiff] to commence actions as [the assignor's] surrogate plaintiff." *Id.* at 58.

Similarly, in *American Optical Co. v. Curtiss,* 56 F.R.D. 26, 31 (S.D.N.Y.1971), the court held that a contract with the express requirement that a lawsuit be initiated violates § 489. There, two employees of the University of Michigan and one of its undergraduates assigned patents on inventions they developed while .at the University to American Cystoscope Makers, Inc., in exchange for a share of any financial benefits realized by American Cystoscope from the inventions. *Id.* at 27. Shortly thereafter, American Optical brought an interference claim against the American Cystoscope patents. *Id.* at 28. While that suit was pending, the University found out about its employees' and student's patents and sought a means to recapture control over the patents. *Id.* In order to do so, the University entered into a contract with American Optical in which the University assigned its rights (if any) to the patents to American Optical; American Optical expressly agreed to sue the employees, the former student and American Cystoscope to compel them to assign the patents to American Optical; American Optical agreed to finance the lawsuit; and both parties agreed that if the lawsuit were successful the patents would be dedicated to the public on a royalty-free basis. *Id.*

The Court held that the assignment contract violated § 489 on the grounds that it specifically required the assignee to bring suit—*i.e.*, American optical would have breached its contract with the University if it failed to do so—and that American Optical's only interest in the claim was derivative of the University's. *Id.* at 30–32. The Court thus found that the University, not the plaintiff, was the "real party in interest" within the meaning of Fed.R.Civ.P. 17(a).

The case of *Ehrlich v. Rebco Ins. Exch., Ltd.*, 225 A.D.2d 75, 649 N.Y.S.2d 672 (Sup. Ct.N.Y.1996), was a dispute between an attorney, Ehrlich, and his client, Rebco, over payment of an annual retainer fee. *Id.* at 76, 649 N.Y.S.2d at 673. Rebco took an assignment from a law firm of a claim against Ehrlich for return of a referral fee, upon which Rebco filed a counterclaim. *Id.* at 76, 649 N.Y.S.2d at 673–74. However, Rebco had no independent interest in the referral fee and the stated "purpose" in the assignment contract was that Rebco should sue Ehrlich in order to "cause" him to pay money owed not to Rebco, but to the law firm. *Id.* The counterclaim was thus dismissed because it was based on an agreement violating § 489. *Id.* at 78, 649 N.Y.S.2d at 674.

Finally, in *Frank H. Zindle, Inc. v. Friedman's Express*, 258 A.D. 636, 17 N.Y.S.2d 594 (1st Dep't 1940), the Court upheld the trial court's dismissal of claims under a predecessor to § 489. The claims had been assigned to the plaintiff by an insurance company, under an assignment agreement that expressly provided that the plaintiff would prosecute the claims in court and remit the entire amount collected to the insurance company, less only a service fee. *Zindle*, 258 A.D. at 637, 17 N.Y.S.2d at 594–95. As such, the plaintiff "was not the true owner" of the claims. *Id.* at 637, 17 N.Y.S.2d 594, 17 N.Y.S.2d at 594.

Other cases cited by the Peru Defendants do not decide the issue of whether the practice complained of violates § 489, but merely deny summary judgment on the grounds that factual issues remain. *See Knobel v. Estate of Eugene A. Hoffman, Inc.*, 105 Misc.2d 333, 432 N.Y.S.2d 66 (Sup.Ct.N.Y.1980) ("To the threshold question of the intent and primary purpose of the agreement, the parties have raised factual issues which require a hearing."); *FLLI Moretti Cereali, S.P.A. v. Continental Grain Co.*, 563 F.2d 563 (2d Cir. 1977) (remanding case because defendant was deprived "of the opportunity to present evidence of the business purpose of the transaction"); *Sprung v. Jaffe*, 3 N.Y.2d 539, 544, 147 N.E.2d 6, 9, 169 N.Y.S.2d 456, 460 (1957) ("Clearly, then, a bona fide issue of fact is presented as to the intent and purpose of the plaintiff in taking an assignment of the chose in action from the executor."); *Aubrey Equities, Inc. v. SMZH 73rd Associates*, 212 A.D.2d 397, 622 N.Y.S.2d 276 (1st Dep't 1995) (ordering further discovery); *Empire Management Corp. v. Russo*, 81 N.Y.S.2d 817, 819 (N.Y.Sup.Ct.1948) (violation is issue of fact); *Commission for Polish Relief v. Banca Nationala A Romanie*, 176 Misc. 1064, 27 N.Y.S.2d 377 (1941) ("[Q]uestion of fact is raised as to whether the assignment was taken for the sole purpose of bringing the action thereon."); *cf. People v. Berlin*, 65 Misc.2d 245, 250, 317 N.Y.S.2d 191, 196 (N.Y.Nassau Ct.1971) (denying demurrer to indictment until evidence introduced regarding intent and purpose for which judgments were purchased since purpose to bring lawsuit may be covered whereas purpose to execute upon judgment would not); *CIBC Bank and Trust Co. (Cayman) Ltd. v. Banco Central do Brasil*, 886 F.Supp. 1105, 1111 (1995) (denying motion to dismiss because intent and purpose of assignment is fact-specific inquiry).[12]

---

**12.** Two additional cases cited by the Peru Defendants must be noted. Peru cites *Koro Co., Inc. v. Bristol–Myers Co.*, 568 F.Supp. 280 (D.D.C.1983). *Koro* is not binding authority on this court, and its holding is not clear. In part, the court relied upon the testimony of one of the attorneys who structured the transaction "that the sole purpose for the assignment was to enable Koro to bring an action on this antitrust claim." *Id.* at 282. Indeed, *Koro* had no corporate purpose other than to bring the suit. *Id.* at 287–88. Moreover, the court commented that voiding the assignment was in part necessary because the treble damages potential of the assigned antitrust claim made the assignment particularly inappropriate. On these specific facts, which are unlike those in the instant case, the court held that the assignment violated § 489.

The legislative history of § 489 tends to establish that whatever mischief the New York legislature intended to prohibit to corporations can be traced to the same mischief originally proscribed only to attorneys. The current text can be traced through a series of statutes to at least as early as an 1813 statute, which provided that if any attorney should purchase or receive, by way of pledge or security for money lent, any bond, note or other writing, with intent to commence a suit thereon, and should commence such suit accordingly, he should be deemed guilty of a misdemeanor. 1 R.L. of 1813, p. 417, § 7. In 1818 a more stringent statute was enacted, providing "that no attorney or counselor-at-law of any *court of record* in this State, shall, directly or indirectly, buy ... any promissory note." Act of April 21, 1818, ch. 259, 1818 N.Y. Laws 278 (emphasis added). A 1920 statute, enacted to extend the prohibition to the courts of justice, introduced the requirement that the purchase must be for the "purpose" of bringing an action. The 1920 statute provided that "no justice of the peace or constable shall, directly or indirectly, buy ... any bond ... or cause of action, *for the purpose of commencing any suit thereon* ...." *See Goodell v. The People,* 5 Parker Cr.R. 206, 207–08 (1862) (citing 3 R.S. 454, § 161) (emphasis added). Thereafter, 2 R.S. 288, § 71, was enacted to prohibit the purchase by attorneys of choses in action, among other things, "with the intent and for the purpose" of bringing a suit thereon, thereby settling on the phrase that persisted through several further amendments to the present text of § 489.

Although the initial statutes were directed at legal practitioners (*i.e.*, attorneys, justices of the peace, and solicitors), the prohibition was extended to corporations at least as early as 1907, when § 77 of the Code of Civil Procedure was amended. The statute, however, did not apply to all corporations. Section 77 provided that § 74 of the Code of Civil Procedure, which prohibited an attor-

ney from, among other things, giving a valuable consideration to any person as an inducement to placing in his hands a demand of any kind *for the purpose of bringing an action thereon,* would apply "to a corporation engaged in the business of conducting litigation and providing counsel therefor, who or which does an act which an attorney or counselor is therein forbidden to do." *See* Act to Amend the Code of Civil Procedure, In Relation To Champertous Agreements, ch. 700, 1907 N.Y. Laws 1588, § 1.

The prohibitions on corporations were modified in 1934, when the New York legislature amended §§ 274 and 276, although the statute's compass remained limited to corporations engaged in certain businesses. *See* Act To Amend The Penal Law, In Relation To Prohibiting The Practice Of Law By A Corporation Or Voluntary Association And Prohibiting Buying Demands On Which To Bring An Action, ch. 534, 1934 N.Y. Laws 419. Section 274 was amended to provide that an attorney may not "directly or indirectly, buy, take an assignment of or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt or other thing in action, with the intent and for the purpose of bringing an action thereon." Section 276 was modified to provide that section 274 applies to "a person, co-partnership or corporation engaged directly or indirectly in the business of collection and adjustment of claims or any officer, director, agent or employee thereof, who or which does an act which an attorney or counselor is therein forbidden to do...."

In 1939, the legislature again modified § 276. The amendment replaced § 276 with new § 275, providing that:

No person or co-partnership, engaged directly or indirectly in the business of collection and adjustment of claims, and no corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit, buy or take an assignment of, or be in any man-

The Peru Defendants also cite *Bottenus v. Blackman,* 71 Misc.2d 583, 336 N.Y.S.2d 790 (Sup.Ct.Nass.Co.1972). However, the Second Department reversed that decision on the grounds that a purchase for the purpose of enforcing the judgment's collection or pursuing its

lien, as for example, by execution is not a prohibited practice under § 489. *Bottenus v. Blackman,* 43 A.D.2d 846, 847, 351 N.Y.S.2d 421, 422 (2d Dep't 1974) (citing *Concord Landscapers, Inc. v. Pincus,* 41 A.D.2d 759, 341 N.Y.S.2d 538 (2d Dep't 1973)).

ner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon . . . .

Act of June 9, 1939, ch. 822, § 13, 1939 N.Y. Laws 2055, at 2058. Finally, when the Penal Law was revised in 1965, § 275 was reenacted into the Judiciary Law as current § 489. Significantly, this most recent revision eliminated the qualification found in previous statutes regarding the business of the corporation covered by the statute, and instead prohibited the conduct from any "corporation or association." This sequence establishes that the prohibition currently applied to corporations and associations against the purchase of debt with the intent and purpose of bringing an action was first applied only to attorneys.

The question of what vice § 489's predecessors prohibited to attorneys might well be helpful, but is inadequately explained by reference to precedent and legislative history. Some consideration of the doctrine of champerty and maintenance, in which § 489 is rooted, is required. *See Fairchild,* 28 N.Y.2d at 329, 270 N.E.2d 691 at 693, 321 N.Y.S.2d at 860 (the legislative concern was "[t]o prevent the resulting strife, discord and harassment which could result from permitting attorneys and corporations to purchase claims for the purpose of bringing actions thereon . . . declaring the practice of champerty and maintenance to be illegal"); *cf.* Act to Amend the Code of Civil Procedure, In Relation To Champertous Agreements, ch. 700, 1907 N.Y. Laws 1588 (title referring to champerty).

Champerty, and the related doctrine of maintenance, has been traced at least as far back as early English law. *See generally,* Percy H. Winfield, *The Present Law Of Abuse of Legal Procedure* (1921) [hereinafter, *Abuse of Legal Procedure* ]; Edmond H. Bodkin, *The Law of Maintenance and Champerty* (1935) [hereinafter *Maintenance*

*and Champerty* ]; Max Radin, *Maintenance by Champerty,* 24 Cal.L.Rev. 48 (1936) [hereinafter *Maintenance by Champerty* ].[13] The history reveals not one proscribed practice, but rather several practices thought to result in a common evil—the "interrupt[ion of] the course of public justice." *Thallhimer v. Brinckerhoff,* 3 Cow. 623, 643 (1824). At bottom, the reason for suppressing champerty and maintenance was an apprehension that "justice itself, was endangered." *Id.* at 644. *See also* 4 William Blackstone, *Commentaries* *135 (the offense "perverts the process of law into an engine of oppression"); 4 *Kent's Commentaries* 509 n. c (George Comstock ed., 11th ed. 1867) (Medieval maintenance and champerty statutes are founded upon the "principle common to the laws of all well-governed countries that no encouragement should be given to litigation by the introduction of parties to enforce those rights which others are not disposed to enforce").

Early applications of the doctrine addressed "[t]he power of great men, to whom rights of action were transferred, in order to obtain support and favor in suits brought to assert those rights; the confederacies which were thus forged; and the oppression which followed from the influence of great men, in such cases." *Id.* at 643. *See also Brown v. Bigne,* 21 Or. 260, 28 P. 11, 12 (1891) "So great was the evil of rich and powerful barons buying up claims, and, by means of their exalted and influential positions, overawing the courts, and thus securing unjust and unmerited judgments, and oppressing those against whom their anger was directed, that it became necessary, in an early day in England, to enact statutes to prevent such practices. . . ." (citing *Slywright v. Pages,* 74 Eng. Rep. 153 (1587)).

"Maintenance" was defined by Lord Coleridge in the English case of *Bradlaugh v. Newdegate,* 11 Q.B.D. 2, 10 (1883), as " 'something against good policy and justice, something tending to promote unnecessary

---

**13.** The prohibition of meddling with another's lawsuit has been traced back even further to the laws of ancient Athens and Rome. *See generally Maintenance by Champerty.* Radin cites, for example, the constitution of Septimius Severus and Caracalla, which uses terms "which are strongly suggestive of champerty. *Id.* at 54 n. 24 (noting reference to the term *societas futuri emolumenti, i.e.* a partnership in the expected profit.").

litigation, something that in a legal sense is immoral, and to the constitution of which a bad motive in the same sense is necessary.' " (quoting *Fischer v. Kamala Naicker,* 19 Eng. Rep. 495, 501 (1860)).[14] In *Bradlaugh,* the court sustained a maintenance claim, where Newdegate had found a third-party, Clarke, to bring an action against Bradlaugh. The court concluded that the action was in truth Newdagate's, that Clarke was a "straw" man, and would not have brought the action if Newdegate had not indemnified him against all consequences. *Id.* at 4.

Champerty, considered to be a species of maintenance, was " 'the unlawful maintenance of a suit in consideration of some bargain to have part of the thing in dispute, or some profit out of it.' " *Id.* at 2. *See also Maintenance and Champerty* at 39 (same).

These definitions provide scant help in sorting permitted practices from those which are prohibited. *See Abuse of Legal Procedure,* at 21 ("Maintenance is officious meddling in a suit. But what is 'officious'? The vagueness of this term has probably saved maintenance from total disappearance from modern law. Most of the medieval litigation on the topic centered on its meaning."). Throughout the cases, however, is a focus on improper motive and a stirring up of litigation for gain, whether financial or otherwise. Since, as Oliver Wendell Holmes observed, "[t]he life of the law has not been logic: it has been experience," [15] the doctrines of champerty and maintenance defy a unifying theory. However, Bodkin summed up his review of the law by concluding:

Perhaps the best test for universal application is whether on the facts the transaction is merely "the acquisition of an interest in the subject matter of litigation bona fide entered into, or whether it is an unfair or illegitimate transaction got up for the purpose of spoil or litigation, disturbing the

peace of families and carried on from a corrupt or other improper motive."

*Id.* (citation omitted).

Today, of course, abuse of process is regulated by the very structure of constitutional democracy, as well as by statute. The constitution guarantees an independent judiciary, for example, and the Federal Rules of Civil Procedure provide for sanctions.

In this context, although the New York state legislature adopted portions of the European champerty and maintenance doctrines, the different social and political context caused observers to question its relevance. As succinctly put in 1824 by the *Thallhimer* court:

(A) resort to the public tribunals for justice, should produce injustice, can be true, only where the administration of justice is weak or corrupt, or where the laws are very imperfect. Where the administration of justice is firm, pure, and equal to all, and where the laws give adequate redress for groundless suits, it is not easy to conceive, that mischief can arise from opening the courts of justice to all suitors, or from contracts by which the fruits of a suit may be divided between him who has the right of action, and him who has contributed advice, expense ... to institute the suit. . . .

*Thallhimer,* 3 Cow. at 643.

■ Nevertheless, § 489's roots in the Medieval law of champerty and maintenance provides support for the conclusion that, while not all assignments with the intent to bring suit thereon are barred, assignments taken for the purpose, or motive, of stirring up litigation and profiting thereby are prohibited.

■ Elliott suggests several theories for limiting the statute's scope to exclude its transactions with SBC and ING. Building on the statute's origins on prohibitions to attorneys, Elliott contends that the only "pur-

---

**14.** In *Fischer,* the central question was whether the party was "suing in respect of his own interest for a violation of a contract made with himself, or was he representing another man's interest, and suing on a contract to which he had been originally a stranger, in virtue only of the

objectionable assignment." *Id.* at 502. The court held that the assignment was enforceable.

**15.** Oliver W. Holmes, Jr., *The Common Law* 1 (1881).

pose" prohibited by § 489 is to take a claim with the purpose of obtaining costs. This theory, however, is not supported by the text, history, or precedent. First, neither the statute, nor any of its predecessors, mentions a cost-incurring purpose. Rather, the purpose prohibited is to bring an action. Nor does Elliott cite any legislative history in support of this proposition. Rather, Elliott relies on dicta, rather than holding, that the exclusive concern of the early statutes had been to curb a perceived abuse by certain lawyers who bought up virtually worthless claims and then sued on them solely or primarily to earn costs, which at that time, unlike today, included attorney's fees. Such fees were recoverable by the prevailing attorney-party plaintiff from the losing defendant-debtor as a matter of course, no matter how little the underlying claim was actually worth, even if it was clear that the case would not otherwise have been brought, and even if judgment was obtained solely by a default. *See Goodell*, 5 Parker Cr.R. at 207.

The earliest case Elliott cites to build its cost-incurring theory is *Baldwin v. Latson*, 2 Barb.Ch. 306 (N.Y.Ch.1847). Baldwin was a lawyer who took an assignment of a bond and mortgage on a building already in default and who then, a few days later, filed suit to foreclose the mortgage just purchased. *Id.* at 306. The defendant (like the Peru Defendants in this case) did not contest the existence of the debt or the default. Instead (again like the Peru Defendants) the defendant in *Baldwin* asserted as his sole defense that Baldwin had taken the assignment and filed suit in violation of the statute because he had allegedly done so "for the purpose of foreclosing the mortgage." *Id.* In reply, Baldwin admitted that he indeed had purchased "the bond and mortgage ... for the purpose of foreclosure," but contended that the statute simply did not apply because in purchasing the mortgage and bringing suit, he had not been motivated to obtain "costs" but rather to obtain possession.

The Court of Chancery, the highest state court of equity before 1848, relied upon Baldwin's interest in preserving a preexisting claimed interest in the mortgaged premises. *Id.* (citing *Van Rensselaer v. The Sheriff of*

*Onondaga*, 1 Cowen's Rep. 443, 458 (1823) (holding that the 1818 law "never meant to forbid the purchase of one demand, for the mere purpose of securing another")). The court also stated that:

The object of the statute was to prevent attorneys and solicitors from purchasing debts, or other things in action, for the purpose of obtaining costs by a prosecution thereof, and was never intended to prevent the purchase for the honest purpose of protecting some other important right of the assignee.

*Id.* at 308. The "other important right of the assignee" referred to the court, however, was Baldwin's pre-existing interest in the property. Accordingly, the court did not squarely hold that cost-seeking alone is the purpose of the statute.

Elliott cites other cases wherein courts have recited *Baldwin*'s dicta that the only proscribed purpose of the statute is assignment for the purpose of incurring costs. For example, Elliott cites *Moses*, which, as discussed above, vacated a jury verdict because the jury instructions permitted conviction for a purchase of debt with the intent to coerce, not to sue. Significantly, in the 1971 *Fairchild* case, which is the Court of Appeal's most recent interpretation of the statute, the court discusses the purpose of § 489 without even mentioning cost-incurring, much less limiting the statute's scope thereto.

The primary authority Elliott cites that holds that the statute is limited to assignments with a cost incurring purpose is *Goodell v. The People*, 5 Parker Cr.R. 206 (1862). Goodell brought his suit in the court of justice, where costs were not obtainable, rather than the court of record, where they could be awarded. *Id.* at 211 (Parker, J.). Accordingly, since costs could not be recovered, the action was not the evil proscribed by the statute, and therefore prosecution could not be sustained. *Id.* The court reasoned:

That the law of 1818, and previous laws on this subject, were intended to reach a class of men who make a practice ... of buying small notes of fifty dollars and upwards, and then prosecuting them ... and make the defendants pay large bills of costs, even when the suit was undefended, there

can be, I think, no doubt. Hence, it was entitled an act to prevent abuses, and to regulate *costs*. The law was aimed at attorneys ... who were the parties receiving the costs, and who thus often oppressed debtors by unexpected and unnecessary prosecutions.

*Id.* at 207 (Campbell, J.) (emphasis in original).[16]

Before *Goodell,* however, courts recognized that the statute was not solely directed at purchase of claims to obtain costs. For example, in *Mann v. Fairchild,* 14 Barb. 548 (1853), the court observed that "[t]he main object of the statute in question was to prevent litigation by prohibiting the purchase of choses in action by those whose pecuniary interest might be peculiarly advanced by instituting suits upon them, and who, in consequence of their position, might conduct their suits upon unequal terms."[17] *Id.* at 554. *See also Ransom v. Cutting,* 188 N.Y. 447, 452, 81 N.E. 324 (1907) ("The purpose of section 74 [a predecessor of § 489] is to prevent an attorney from encouraging, instigating or promoting ill feeling and strife, and thereby securing the ownership or control of a demand of any kind for the purpose of bringing an action thereon.").

Indeed, as discussed above, the only cases cited by either party where courts upheld a violation of S 489 or its predecessors involved not assignments of trivial claims with the purpose to obtain costs, but rather assignments where the very contract would be breached if the contracting party did not institute litigation. *See Refac,* 131 F.R.D. at 58, *American Optical Co.,* 56 F.R.D. at 31, *Ehrlich,* 225 A.D.2d at 78, 649 N.Y.S.2d 672.

649 N.Y.S.2d at 674; *Zindle,* 258 A.D. at 637, 17 N.Y.S.2d at 594–95.

 Elliott also suggests that the only assignments prohibited to corporations are where the corporation engages in the unauthorized practice of law through the device of taking claims with the intent to sue on them *pro se,* without involving counsel. Elliott chiefly relies on legislative history, noting that before the current statutory language was enacted in 1939 as § 275, there existed § 280 of the Penal Law, entitled "Corporations not to practice law," which was enacted in 1909 and provided that "[i]t shall be unlawful further for any corporation to solicit itself or by or through its officers, agents or employees any claim or demand for the purpose of bringing an action thereon." *See* An Act to Amend the Penal Law, In Relation To Corporations Practicing Law, ch. 483, § 1, 1909 N.Y.Laws 1170. Elliott contends that the 1939 amendment · which enacted new § 275 and expanded the statute's scope to corporations without any limitation as to the nature of their business merely excises this language from § 280 and grafts it onto the new § 275, and therefore is encumbered by the same focus on corporations practicing law.

While the addition of the prohibition to corporations in § 275 did result in its removal from § 280, *see* Act of June 9, 1939, ch. 822, §§ 13, 15, 1939 N.Y.Laws 2055, there is no evidence that the original language in § 280 was directed at the limited purpose Elliott attributes to it. As with Elliott's theory that § 489's predecessors were concerned solely with assignments to attorneys with a cost-incurring motive, the theory is not supported by the text or precedent.

16. Other courts have also recited the cost-obtaining prohibition of the statute, although a holding that such conduct is the sole prohibition was not necessary to their outcomes. *Cf. Wetmore v. Hegeman,* 88 N.Y. 69, 73 (1882) (assignment of a pending suit not a violation since "[t]he aim of the statute was to prevent attorneys from purchasing claims for the express purpose of instituting suits thereon and thus oppressing debtors and making costs"); *Beers v. Washbond,* 86 A.D. 582, 584, 83 N.Y.S. 993, 994 (3d Dep't 1903) (statutory intent to prevent "oppression by unnecessary litigation which would follow from the right of an attorney to purchase a claim for the sole purpose of enforcing it in the courts and

getting costs therefrom" is not violated by permitting attorney to assign title obtained in violation of statute).

17. In *Mann,* the court construed 2 R.S. 288, § 71, which, as discussed above, provided that "no attorney ... shall directly or indirectly buy ... any bond ... or other thing in action, with the intent, and for the purpose, of bringing any suit thereon." *Id.* at 554 (citing). The court did not, however, decide whether the facts presented constituted the requisite purpose, because the purpose was assumed for purposes of the demurrer.

Pre–1939 § 280's text does not mention costs as the only prohibited purpose, nor does Elliott cite any case expressly holding so. Moreover, the inclusion of corporations in new § 275 does not mention costs, and subjects corporations to the same prohibition previously only applied to corporations in the collections business, for which there is no evidence that a cost-incurring motive was the exclusive statutory prohibition.

Elliott's strongest suggestion for limiting the scope of § 489, perhaps, is that the statute does not apply where all right, title, and interest are conveyed by the assignor. This might explain the modern cases finding a § 489 violation where the lawsuit is the subject matter of the assignment agreement. *See Refac*, 131 F.R.D. at 58, *American Optical Co.*, 56 F.R.D. at 31, *Ehrlich*, 225 A.D.2d at 78, 649 N.Y.S.2d 672. 649 N.Y.S.2d at 674; *Zindle*, 258 A.D. at 637, 17 N.Y.S.2d at 594–95. In those cases, the assignee's interest was dependent on bringing suit—it is part of the consideration. This theory would also bring the statute in line with the champertous assignments that seemed to be the focus of the English statutes and common law. As discussed above, champerty in England at the time § 489's predecessors were enacted was generally considered to be " 'the unlawful maintenance of a suit in consideration of some bargain to have part of the thing in dispute, or some profit out of it.' " *Abuse of Process* at 2. According to this theory, it is the conspiracy between the assignor and the assignee to bring an action that is forbidden.

Yet, Elliott's own suggestion that the purchase of claims to bring suits and obtain costs refutes this construction. Although Elliott cites cases to support its proposition that the sole concern of the statute is the buying of trivial claims to obtain disproportionate costs, no case requires that the assignor of the claim be part of the conspiracy and retain some interest in the assigned right.

Furthermore, there is no textual support for the proposition that the retention of any interest by the assignor is necessary to fall

within the statutory compass. The statute refers only to the assignee's purpose, not the assignor's. As previously discussed, the challenge here is to interpret § 489, and thus even if champerty and maintenance required a retained interest by the assignor, the expansions, restrictions and alterations of those doctrines that are reflected in the statute are what is relevant today.

Lower New York courts have found that a purchase of a debt with the intent to sue does not always violate § 489. If these cases are decided correctly, they stand for the proposition that the prohibited meddling in a lawsuit must in some way "cause strife" and stir up litigation. The main line of cases cited involve the purchase of defaulted mortgages for the purpose of foreclosure, and the courts considering these transactions have concluded that the practice involved is "legitimate" in the sense that it is not the type of evil § 489 is directed against. *Cf. Brown*, 28 P. at 13 ("The gist of the offense consists in the officious intermeddling in another suit, and contracts not within the mischief to be guarded against should not be held to come within the rule.").

The First and Third Departments of the Appellate Division have held that the practice of purchasing the assignment of a mortgage with the purpose to foreclose does not violate § 489. In *Limpar Realty Corp. v. Uswiss Realty Holding, Inc.*, 112 A.D.2d 834, 492 N.Y.S.2d 754 (1st Dep't 1985), the plaintiff purchased the assignment of a mortgage after the assignor had accelerated it upon the defendant's default. Furthermore, the plaintiff commenced suit within one month of the assignment without any negotiation or demand for a cure. The court held, however, that § 489 was not violated since the plaintiff's purpose was to gain possession of the property, which was "a legitimate business purpose." 492 N.Y.S.2d at 755–56. *See also Wainco Funding v. Logiudice*, 199 A.D.2d 950, 606 N.Y.S.2d 86 (3d Dep't 1993) (same). In these cases, unlike here, there is no suggestion that but for the assignment litigation would likely have been averted.[18]

---

**18.** Elliott cites the New York Supreme Court case of *Goldstein v. Thirlex Realty, Inc.*, 91

Misc.2d 851, 398 N.Y.S.2d 791 (Sup.Ct. N.Y. Co.1977). Attorneys purchased a mortgage in

This brings us the question presented, which is whether Elliott's practice of purchasing debt with the intent to sue after all other debtholders had withdrawn their lawsuits and had reached a settlement agreement with Peru to restructure virtually all of the country's external commercial debt is a prohibited practice under § 489, thereby constituting a purchase "with the intent and for the purpose" of bringing an action thereon. Although no New York case squarely holds that this practice is prohibited, it is undoubtedly within the language of the statute and the mischief the statute was intended to remedy.

The facts found above establish that Elliott bought the debt with the intent to sue, as the testimony introduced by Elliott's witnesses regarding alternative investment strategies lacked credibility. The facts also establish that on October 25, 1990, Peru signed an agreement with the BAC to stay the lawsuits filed by its commercial lenders; and entered into negotiations to restructure the debt. The facts also establish that in December 1994 the pending lawsuits by all commercial lenders were dismissed, with the exception of Pravin Banker, and on October 27, 1995, Peru and the BAC publicly announced an agreement in principle for a debt restructuring plan. Elliott purchased the debt at issue here after the agreement in principle was reached. Thereafter, the debtholders executed the Exchange Agreement and closed the deal.

On these facts, but for Elliott's practice, no litigation would have ensued from any party other than Pravin Banker, who purchased their debt before the agreement in principle was reached. "The resulting strife, discord and harassment," *see Fairchild,* 28 N.Y.2d at 329, 270 N.E.2d at 693, 321 N.Y.S.2d at 860, which resulted is the type of mischief the statute was enacted to avert.

This case is not like the mortgage foreclosure cases such as *Baldwin, Limpar,* or *Wainco* since in those cases there was no contention that the prior debtholder had reached an agreement in principle to settle the dispute. Accordingly, the practice of buying the mortgage and foreclosing thereon did not result in the stirring up of strife for the purposes of speculating in a lawsuit, but rather asserted a right in a pre-existing dispute.

Neither, however, is this case a perfect match to the prohibited practice noted in *Baldwin, Moses, Goodell* and other cases of attorney's purchasing claims for the purpose of collecting large legal bills. Here the attorney's fees, even for the caliber of talent retained by Elliott, are small compared to the total damages claimed and the expected profit if Elliott prevails. Nor is it like the practice of contracting to sue where failure to bring an action would result in a contract

---

default, after the assignor bank wrote the defendant that it intended to commence foreclosure proceedings unless the arrearages were paid, and brought suit without first demanding payment. *Goldstein,* 91 Misc.2d at 852, 398 N.Y.S.2d at 792. The plaintiffs admitted "that their purpose in taking [the] assignment of the mortgage was to foreclose on the property." *Id.* at 852–53, 398 N.Y.S.2d 791, 398 N.Y.S.2d at 792–93. Nevertheless, the court found no violation of § 488 on the grounds that the statute only precludes "attorneys from purchasing things in actions for the purpose of obtaining costs," citing *Moses* and *Baldwin.* As previously discussed, neither Moses nor Baldwin so held. However, although the reasoning is faulted, the outcome in Goldstein is consistent with other cases holding that the purchase of defaulted mortgages does not violate § 489.

Elliott also cites *Wightman v. Catlin,* 113 A.D. 24, 98 N.Y.S. 1071 (2d Dep't 1906). In *Wightman,* a landlord's attorney wrote to a tenant who was in default of his rent payments demanding payment. *See id.* at 26, 98 N.Y.S. at 1072. The landlord assigned the claim to the plaintiff, who filed suit within a few days. The defendant alleged that the rent claim had been assigned solely for purposes of instituting a collection suit. The Second Department held:

> [T]he evidence would fail to establish the necessary facts to bring him within the prohibition of the statute, for it clearly does not show that his object was the bringing of the action for the purpose of costs, *or for any other purpose,* except the collection of this legitimate claim after the defendant had neglected to pay the same within the time limited in the original notification.

113 A.D. at 27–28, 98 N.Y.S. at 1073–74 (emphasis added). The court therefore did not squarely hold that only cost-incurring purpose would violate the statute, and concluded that the practice of suing after a demand was made by the assignor was not the type of purpose prohibited by the statute.

breach condemned in *Refac, American Optical, Ehrlich* and *Zindle.*

▮ Failure to fit a previously proscribed practice is not fatal to the Peru Defendants' defense. As Elliott contends, § 489 is a penal statute which should be narrowly construed.[19] However, the Court cannot narrow it beyond its language and a reasonable interpretation of the legislature's intent. Without seeking to comprehensively define the sweep of § 489, the Court is compelled to conclude that Elliott's purpose here violated the statute. Elliott formed the intent to sue Peru before it decided to purchase the debt. Its purpose was to stand apart from the lenders who had agreed to the Brady restructuring, and to use judicial process to compel full payment. Thus, Elliott's sole or primary purpose was to bring the lawsuit.

This holding does not, as Elliott suggests, result in the perverse result that any debtor can *ex post facto* prevent assignment of its debt by publishing to the world that it will not pay unless sued. In such a case, the lack of an agreement in principle with the debtholders would bring the case within the rule of *Limpar*, where a dispute was on-going, rather than the facts here.

▮ Purported contractual agreements will not be enforced under New York statutory and common law for a variety of reasons. As discussed more fully below, parties cannot waive by contract the consequences of a statute enacted for a public interest, rather than

a purely private one. New York statutes bar contract claims contract actions after a certain period of time. *See* N.Y. C.P.L.R. § 213(2) (barring contract actions after six years). Additionally, contracts are not enforced if they are unconscionable. See N.Y. U.C.C. § 2–302(1) ("If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract. . . .").

Here Elliott's conduct has resulted in strife. Indeed, Peru characterizes Elliott's conduct as international piracy and a hold-up. Whether this strife is an improper use of the judiciary is not a question for this Court to decide. As discussed above, here a statute is being construed, not the common law, and so it is the intent and language of the state legislature that controls, whether or not the policy is outdated. To hold otherwise would be to either give no effect to the statute, or to set limits without sufficient evidence that the New York legislature so intended, solely because of a policy disagreement. This the Court cannot do.

▮ Accordingly, the Elliott's assignment contracts violate § 489, and therefore cannot be enforced.[20]

### III. *Peru Did Not Waive Its Right to Assert A Defense Under Section 489 of the Judiciary Law*

▮ Elliott contends that even if § 489 does apply to the instant action, Peru irrevo-

---

**19.** Elliott cites several cases for the proposition that since § 489 is grounded in the champerty doctrine, it is merely technical and disfavored. *See Sedgwick v. Stanton*, 14 N.Y. 289, 301 (1856) (referring to the "hostility" "which ha[s] been before so often exhibited" "to the principles of the law of champerty," a "technical rule of the common law"); *Crary v. Goodman*, 22 N.Y. 170, 177 (1860) ("Champerty . . . is the relict of an ancient policy."); *Saranac Land & Timber Co. v. Roberts*, 125 A.D. 333, 345, 109 N.Y.S. 547, 551 (3d Dep't 1908), *aff'd*, 195 N.Y. 303, 88 N.E. 753 (1909) ("[T]he defense of champerty . . . . is technical, unmeritorious, and has been regarded with growing disfavor by courts and legislatures in England and this country for more than 100 years"). These cases, however, do not involve either § 489 or its predecessors. In *Sedgwick*, the court held that no statute covered the wrong complained of, and that the common law doctrine of champerty does not apply in New York other than by statute. *Sedgwick*, 14 N.Y. at 291

(Hubbard, J.); *Id.* at 301 (Selden, J.). The *Crary* and *Saranac* actions were both brought pursuant to a real property statute providing that "[e]very grant of lands shall be absolutely void if at the time of the delivery thereof such lands shall be in the actual possession of a person claiming under a title adverse to that of the grantor." *See Crary*, 22 N.Y. at 175; *see also Saranac Land & Timber Co.*, 109 N.Y.S. at 556. Neither case, therefore, bears on the proper interpretation of § 489.

**20.** Elliott also contends that § 489 is not violated because (1) Elliott, as a limited partnership, is not an "association" within the meaning of the statute; (2) Peru's interpretation of the statute would render it violative of the Commerce Clause of the United State Constitution; and (3) the Peru Defendants lack standing because they were not parties to the assignment agreements. After carefully considering these issues, it is concluded that they have no merit.

cably and unconditionally guaranteed payment under the 1983 Letter Agreements and is thus precluded from interposing any defenses to its liability under the Guaranty. In particular, Section 3 of the Guaranty provides that Peru shall pay all such amounts "regardless of any law, regulation or order now or hereafter in effect in any jurisdiction...." Further, Section 3 provides that the Guaranty shall be "absolute and unconditional irrespective of ... any other circumstance which might otherwise constitute a defense available to a ... any Obligor." *Id.* The text of the waiver is sufficiently broad to embrace the Peru Defendant's defense based on § 489 of New York's Judiciary Law.

■ Peru contends, however, that the waiver is ineffective because § 489 is a penal law directed at the public interest, and therefore cannot be waived. Under New York law, a contracting party may waive a statutory or even a constitutional provision enacted for his benefit or protection where a private right is involved and the public interest is not. For example, in *Selzer v. Baker,* 295 N.Y. 145, 149–50, 65 N.E.2d 752, 753–54 (1946), the court held that a contractual waiver of the statutory period of redemption pursuant to a tax sale was within the "general rule [that] a party may waive a statutory or even a constitutional provision enacted for his benefit or protection, where it is exclusively a matter of private right, and no considerations of public policy or morals are involved". *See also Elliott Assocs., L.P. v. Republic of Panama,* 1996 WL 474173, *6–7 (S.D.N.Y. August 21, 1996) (permitting waiver of statutory right under the Foreign Sovereign Immunities Act to remove an action to federal court).

On the other hand, a right conferred by statute upon a private person but which affects the public interest may not be waived. For example, in *Yaksich v. Relocation Realty Service Corp.,* 89 Misc.2d 410, 412, 391 N.Y.S.2d 822, 823 (Sup.Ct. Erie Co.1977), the court held that private parties could not waive a sanitation code requirement that no transfer of title to property may be made or accepted without a Health Department Inspection and approval of the property's sewage disposal system. Since the statute was "designed to promote the health and welfare of the general public" it was unwaiveable. *Id.* at 412, 391 N.Y.S.2d 822. *See also John J. Kassner & Co., Inc. v. City of New York,* 46 N.Y.2d 544, 551, 389 N.E.2d 99, 103, 415 N.Y.S.2d 785, 789 (1979) (statute of limitations is founded in public policy, and may not be waived prior to accrual of cause of action, although statute provides for waiver after accrual under certain circumstances).

The issue here is whether Peru's right to assert that this Court cannot enforce the debt because Elliott violated § 489 is a purely private right affecting only private parties, or whether it is a private right which affects the public interest, and therefore is unwaiveable. New York Judicial Law § 489 provides in pertinent part:

[N]o corporation or association, directly or indirectly ... shall solicit, buy or take an assignment of ... a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon.

N.Y.Jud.Law § 489. Section 489 is a penal statute, and violation is a misdemeanor punishable by "a fine of not more than five thousand dollars." *Id.*

■ Although the statute does not convey a private right of action, its violation may be asserted as a defense to a contract action. "The law is well settled that a contract made in violation of the penal statute is void and unenforceable" and therefore a violation of 489 may be asserted as a defense in a breach of contract action. *See Zindle,* 258 A.D. 636, 636–37, 17 N.Y.S.2d 594, 595–95 finding § 489 violation, voiding assignment contract and dismissing complaint (citing *Morgan Munitions Supply Co. v. Studebaker Corp. of Am.,* 226 N.Y. 94, 123 N.E. 146 (1919) ("No person can maintain an action to which he must trace his title through his own breach of the law.")); *Refac,* 131 F.R.D. at 58; *cf. Sprung,* 3 N.Y.2d at 544, 147 N.E.2d at 9, 169 N.Y.S.2d at 460 (although denying summary judgment, court notes that "[i]f it be found at the trial that plaintiff did in fact violate section 274 of the Penal Law [a related predecessor statute], a dismissal of his

complaint is required" (citing *Morgan Munitions* )).

The very reason the assignments would be void under § 489, that they violated the public policy of New York and are unenforceable, places it squarely in the group of statutes that cannot be waived. Elliott cites no cases to the contrary—where the consequences of violating a penal statute are waiveable by contract between private parties. Indeed, in contending that a clear and convincing burden of proof should prevail, Elliott notes that this is a criminal statute involving "moral turpitude." Moreover, as discussed above, § 489 is directed at avoiding—the "interrupt[ion of] the course of public justice," *Thallhimer,* 3 Cow. at 643, which is a matter of public, and not purely private, concern.

## IV. *The Peruvian Decree Does Not Excuse Banco From Its Contractual Liability*

The next issue to address is whether Banco is excused from liability because of impossibility of performance. The Peru Defendants contend that Banco should be excused from liability on the grounds that it was impossible for Banco to perform on the 1983 Letter Agreements due to a supervening governmental order, pursuant to which Banco was purportedly removed as debtor under the 1983 Letter Agreements. Because Banco was prevented by sovereign decree from performing its contract, the Peru Defendants contend, the doctrine of impossibility of performance excuses Banco from liability for its failure to perform.

Elliott, on the other hand, contends that the Peruvian decree is not presumptively valid in New York because the act of state doctrine is inapplicable, and therefore the foreign law can have no effect on contractual rights for property located in New York, where the agreement is governed by New York law.

The act of state doctrine says that the courts of this country will not inquire into the validity of acts of a foreign state, no matter how repugnant those acts (such as expropriations) may be to United States law and policy. *See, e.g., Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). The doctrine, however, applies "*only* if the situs of the debt [which is the subject of the foreign enactment] is within the borders of the foreign sovereign." *See Pravin,* 895 F.Supp. at 664 n. 4 (discussing *Allied Bank Int'l v. Banco Credito Agricola De Cartago,* 757 F.2d 516 (2d Cir.1985)) (emphasis in the original), *aff'd,* 109 F.3d 850 (2d Cir.1997). It does not empower a United States court to give effect to a foreign sovereign's acts or enactments that purport to have effect outside the foreign state's borders. *See id.; Allied Bank,* 757 F.2d at 521. This Court, in the *Pravin Banker* litigation, has already noted that the situs of the obligations created in the 1983 Letter Agreements is New York, not Peru. *Pravin,* 895 F.Supp. at 664 n. 4 (noting that "the situs of the debt in *Allied* was New York, not the foreign country" and concluding that "[t]he situs of the Banco Popular debt in question [in *Pravin Banker* ] is New York").

The Court, however, need not address this issue because, even absent the act of state doctrine contention, the Peru Defendants have not established a sufficient record to show that the contractual duty would be discharged even if the Peruvian decree did affect the 1983 Letter Agreement obligations in New York. Peru Defendants cite *L.N. Jackson & Co. v. Royal Norwegian Gov't,* 177 F.2d 694, 697 (2d Cir.1949), for the proposition that a contractual duty is automatically "discharged ... where performance is subsequently prohibited by [a government] order." That case arose in the unique context of World War II, and "exonerat[ed a party] who yield[ed] to the [United States] government's demands in wartime." *Id.* at 701 (citing *Mawhinney v. Millbrook Woolen Mills, Inc.,* 231 N.Y. 290, 298–301, 132 N.E. 93 (1921)) (in context of World War I, court held that where "act of Congress applies and government work has delayed the execution of other contracts, such delay is excused at law; it is a defense to an action for a breach of contract").

The foreign owner of a vessel contracted with a buyer of copra to carry copra from Africa to the United States. Before the ves-

sel owner could perform, however, the attack on Pearl Harbor occurred and the United States declared war on Japan. The Assistant Director of the Division of Emergency Shipping of the Maritime Commission ordered the vessel owner to substitute wool for copra, and the plaintiff brought an action for breach of contract. The court held that the circumstances, in the absence of clear and unilateral fault, excused performance, *id.* at 699, noting, among other things, the common knowledge of those in the shipping industry that war was on the horizon as well as New York precedent excusing performance in like situations. *Id. See also Hamilton Rubber Mfg. Co. v. Greater New York Carpet House, Inc.,* 47 N.Y.S.2d 210, 211 (Sup.Ct.1944) (performance impossible by order, rule and regulation of the War production Board), *aff'd,* 269 A.D. 681, 53 N.Y.S.2d 954 (1st Dep't 1945).

The facts presented here are not similar to the unique circumstances considered in *L.N. Jackson & Co., Mawhinney, and Hamilton Rubber,* where New York courts excused performance under contracts governed by New York law where the United States or its agents prohibited performance during wartime.

The Peru Defendants do not cite any case with facts similar to the instant one where performance was excused. Plaintiffs cite *Maple Farms, Inc. v. City Sch. Dist.,* 76 Misc.2d 1080, 352 N.Y.S.2d 784 (Sup.Ct. 1974), but in that case the court granted summary judgment for defendant in a declaratory judgment action brought by plaintiff to declare that a contract to sell milk was excused due to impossibility of performance. The Court held that the rise in milk prices was not totally unexpected and that the risk of an abnormal substantial rise in price should be allocated to the seller. 352 N.Y.S.2d at 790. The case did not involve an intervening law enacted by a foreign government purportedly rendering the contracting party's performance impossible.

The Peru Defendants also cite *Organizacion JD Ltda. v. United States,* 18 F.3d 91 (2d Cir.1994), *cert. denied,* 512 U.S. 1207, 114 S.Ct. 2679, 129 L.Ed.2d 813 (1994). In 1990, the government seized numerous electronic fund transfers alleged to involve the proceeds of illicit drug trafficking. *Id.* at 93. The intended recipients of the funds brought an action against the banks involved with the transfer, contending among other things breach of contract. The court held that the judicial action of ordering the seizures of the funds "rendered any enforceable contract impossible to perform." *Id.* a 95. The intervention of a United States district court ordering the seizure of funds is not similar to the enactment by the Peruvian Government of a decree purporting to relieve Banco of its debts.

Even if, as the Peru Defendants assert, the Restatement (Second) of Contracts § 261 has been adopted by New York courts, the impossibility defense has not been established. That section provides:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or circumstances indicate the contrary.

The Peru Defendants contend that here, Banco was prohibited from making foreign debt payments by virtue of Emergency Decree No. 09–94. Pursuant to that decree, Peru subrogated Banco as debtor of the loans of foreign banks. Compliance with the decree was compulsory—both Banco and its employees were subject to sanctions for failure to comply.

The Peru Defendants have not established, however, that the emergency decree was an event the non-occurrence of which was a basic assumption on which the contract was made. The contention that the 1983 Letter Agreements are silent on allocating to Banco the risk of supervening governmental action, and that the decree's language that it is an "extraordinary measure[ ]," are insufficient to establish, as they must, that the possibility that Peru would intervene in Banco's foreign debt obligations were not contemplated at the time the agreements were made. Ac-

cordingly, Banco cannot avert liability by claiming impossibility of performance.[21]

### CONCLUSION

For the reasons set forth above, judgment will be entered dismissing the complaint with costs and disbursements to the Peru Defendants.

It is so ordered.

---

**21.** Because the Court holds that the impossibility defense is not available to Banco, Elliott's contention that the defense should be barred because the Peru Defendants failed to comply with the authentication requirements applicable to its foreign law exhibits, pursuant to Rule 44 of the Federal Rules of Procedure and Rule 902 of the Federal Rules of Evidence, need not be considered.