ELLIOTT ASSOCIATES, L.P., Plaintiff,

v.

BANCO de la NACION, Defendant.

Elliott Associates, L.P., Plaintiff,

v.

The Republic of Peru, Defendant.

Nos. 96 Civ. 7916(RWS), 96 Civ. 7917(RWS).

United States District Court, S.D. New York.

June 1, 2000.

Weil, Gotshal & Manges, by Otto G. Obermaier, Mitchell D. Haddad, Ross E. Morrison, of counsel, New York City, for Plaintiff.

Baker & Hostetler, by Mark A. Cymrot, Peder A. Garske, Mark I. Bailen, of counsel, Washington, DC, for Defendants.

## OPINION

SWEET, District Judge.

Plaintiff Elliott Associates, L.P. ("Elliott") has moved, pursuant to Rules 54 and 56; Fed.R.Civ.P., for summary judgment and for judgment. Defendants Banco de la Nacion ("Nacion") and the Republic of Peru ("Peru") (together, "Defendants") have cross-moved for reconsideration, to dismiss the action, and to strike Elliott's expert report. For the reasons set forth below, Elliott's motions will be granted, and Defendants' motions will be denied.

### Prior Proceedings

The facts and prior proceedings in these actions have been set forth in several opinions of this and other courts, familiarity with which is assumed. See, e.g., Elliott Assocs. L.P. v. Banco de la Nacion, 194 F.3d 363 (2d Cir.1999) ("Elliott V"); Elliott Assocs., L.P. v. Banco de la Nacion, 12 F.Supp.2d 328 (S.D.N.Y.1998) ("Elliott IV"); Elliott Assoc. L.P. v. Banco de la Nacion, 176 F.R.D. 93 (S.D.N.Y.1997); Elliott Assocs. L.P. v. Banco de la Nacion, 961 F.Supp. 83 (S.D.N.Y.1997); Elliott Assocs. L.P. v. Banco de la Nacion, 948 F.Supp. 1203 (S.D.N.Y.1996). Facts and proceedings relevant to the instant decision are set forth below.

Following the Second Circuit's reversal and remand, see Elliott V, 194 F.3d 363, of this Court's judgment in favor of Defendants, see Elliott IV, 12 F.Supp.2d 328, Elliott sought, by Order to Show Cause dated October 31, 1999, an Order of Attachment and Restraint on assets of Defendants sufficient to satisfy the sums of $39,900,884.45 (as to Peru) and $15,606,224.62 (as to Nacion). On November 2, 1999, this Court issued the Order of Attachment and Restraint.

Elliott filed the instant motion on November 23, 1999. Defendants filed their cross-motion on December 28, 1999. Oral argument on these motions was first heard on January 19, 2000. After further discovery regarding damages calculations and further briefing on the issues raised in the parties' moving papers, further oral argument was heard on February 10, 2000, and on March 22, 2000, at which point the motions were deemed fully briefed.

## Facts

Elliott's Complaint in the action against Nacion, 96 Civ. 7916, sought payment of defaulted loans aggregating $7,000,000 in face amount, plus accrued and accruing interest and enforcement expenses. Elliott's Complaint against Peru, 96 Civ. 7917, sought the enforcement of Peru's guaranty of Nacion's debt and that of Banco Popular del Peru, a bankrupt Peruvian bank. Peru's guaranty aggregated $20,682,699.04 in face amount, plus accrued and accruing interest and enforcement expenses.

On December 30, 1996, Defendants had issued discovery requests for documents and communications pertaining to principal and accrued interest, which Elliott agreed to produce on January 24, 1997. Elliott did not, however, produce those documents at that time, nor did it produce at any time prior to trial an expert report or disclose the name of any expert witness who might testify as to accrued interest on the debt.

On April 29, 1997, the Court issued a pretrial order providing for a discovery and motion cut-off date of July 30, 1997, and a due date of August 6, 1997 for a joint proposed pretrial order. The parties were instructed to be ready for trial on August 7. However, on August 1 the discovery deadline was extended until September 3, 1997. Negotiations pertaining to the joint pretrial order followed, and an amended joint pretrial order was eventually issued on January 26, 1998 (the "Pretrial Order"). Elliott did not list any expert witnesses in the Pretrial Order, and its list of exhibits did not contain any exhibits setting forth the 19 prime rates and default dates for the 23 letter agreements (the "Letter Agreements") between the Defendants and the original lenders of the debt Elliott was seeking to collect.

A bench trial commenced on March 17, 1998. Elliott rested after calling Paul Singer, Elliott's general partner. Defendants then moved for a directed verdict based on Elliott's failure to submit evidence concerning damages. Elliott's counsel, Otto G. Obermaier, responded that the damages calculations were in the Pretrial Order, and then urged the Court to refer the question of interest calculation to a referee. The Court, however, concluded that evidence pertaining to damages was required to be introduced at trial, and Elliott then moved to reopen its case-in-chief and introduce damages evidence the following day. John D. Finnerty, a mathematician and partner of PricewaterhouseCoopers LLP, was contacted by Elliott on the same day in connection with the instant actions to perform interest calculations. However, the next day, March 18, 1997, Elliott moved to bifurcate the trial, severing the damages issue from the issue of liability, under Fed.R.Civ.P. 42. The motion was granted by the Court. Elliott had not requested to bifurcate the trial during discovery or the pretrial proceedings. Elliott's counsel has represented to this Court that any failure to move to bifurcate the damages issue prior to trial was "inadvertent."

After the trial, the Court dismissed both actions. While finding that Defendants had breached their respective obligations, the Court held that Elliott had violated New York Judiciary Law § 489, thereby precluding recovery for the breaches as a matter of law. See Elliott IV, 12 F.Supp.2d at 344. Thus, the issue of damages was never tried. The Court of Appeals for the Second Circuit subsequently reversed the Court's holding as to § 489, remanding the case solely for the purpose of accurately calculating damages. See Elliott V, 194 F.3d at 381. Defendants' petitions to the Second Circuit for rehearing and rehearing en banc were denied on May 9, 2000.

Meanwhile, during 1997, Elliott, through its wholly-owned company Manchester Securities Corp., had retained a firm in Albany, New York, to lobby the New York State Legislature to amend New York's General

Obligations Law § 5–527, allegedly in order to overcome a prior ruling of this Court in a separate case holding that compound interest was not recoverable on certain loan agreements executed prior to June 24, 1989 which had the same contractual language pertaining to compound interest as is found in the Letter Agreements in the instant actions. *See Pravin Banker Assocs. v. Banco Popular del Peru,* 912 F.Supp. .77, 82–83 (S.D.N.Y. 1996). The lobbying materials submitted to the legislature in support of the amendment did not disclose the relationship of Manchester Securities to Elliott nor that Elliott was seeking a benefit in a pending lawsuit.

The lobbying effort was successful and an amended version of General Obligations Law § 5–527 was signed by Governor Pataki on July 29, 1997.

Elliott's instant motion relies on Finnerty's calculations. Finnerty calculated the interest due under the Letter Agreements between Nacion and Popular, as borrowers, and the original lenders. Finnerty grouped the loans into two categories: $13,682,678.95 for Popular, and $7,000,000 for Nacion. He was supplied default dates of August 1, 1992 for the Popular debt, of August 1, 1988 for $2,000,000 of the Nacion debt, and of November 1, 1988 for the remaining $5,000,000 of the Nacion debt. The default dates are based on the assignment agreements entered into by Elliott, Swiss Bank, and ING Bank, and were introduced into evidence at the trial.

Based on the terms of the Letter Agreements, Finnerty determined that there were five components of interest due under each loan, as follows:

1. Interest on unmatured principal: the interest that accrued (but was not paid), calculated on a simple-interest basis, *through* the respective principal due dates;

2. Interest on matured principal: interest accrued, calculated on a simple-interest basis, *since* the respective principal due dates;

3. Interest on the interest on unmatured principal: interest on the accrued and unpaid interest up to the respective principal due dates;

4. Compound interest on interest on unmatured principal: interest accrued on a compound basis beginning June 24, 1989 on the interest earned on the unmatured principal;

5. Compound interest on the interest on matured principal: interest accrued on a compound basis beginning June 24, 1989 on the interest earned on the matured principal.

Finnerty's calculations required obtaining the prime rates of the various lenders for the applicable historical time periods. Initially, the lenders would not supply Finnerty with their historical prime rates, so Finnerty utilized the average of the daily U.S. prime rates for each applicable period obtained from the Federal Reserve Board. After the Defendants challenged the validity of Finnerty's calculations based on these prime rates, Finnerty made a second effort to obtain the actual historical prime rates of the lenders, and managed to obtain the actual rates for 14 of the 19 lenders which had entered into the 23 Letter Agreements. Finnerty then calculated the average difference between the actual historical prime rates and the average rate he had used in his initial interest calculations, and found that the average difference between the two rates was .0017%. The amount due on the debt was then recalculated using an average rate .0017% less than the rate initially used for the 5 banks which did not provide their historical prime rates.

Finnerty's original calculations using the historical average prime rate are set forth in Attachment A. The total damages against Nacion, calculated through November 17, 1999, amount to $23,151,154.68. The total damages against Peru calculated through the same date amount to $52,103,910.11. The revised calculations using the actual historical prime rates and the .0017% difference formula are set forth in Attachment B. Under the revised calculations, total damages against Nacion as of the same date amount to $23,137,434.59, and damages against Peru amount to $52,089,479.18.

### Discussion

Elliott seeks entry of judgment for at least $23,151,154.68 as against Nacion, and for at least $52,103,910.11, as against Peru. These

sums do not include the costs and expenses of enforcing Elliott's rights under the respective lending instruments.

Defendants have opposed entry of judgment on numerous grounds. They have asked the Court to strike Finnerty's report, reconsider the decision to allow Elliott to reopen its case, and conduct an inquiry into Elliott's bad faith. In addition, Defendants have claimed that Elliott has failed to prove damages and that it is not entitled to interest on interest. These contentions, however, lack merit.

### I. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be· drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir. 1995); *Burrell v. City Univ.,* 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the non-movant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell,* 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991)).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues—

where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985).

For a dispute to be genuine, there must be more than "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is ·not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

### II. The Expert Report Will Not Be Stricken

Defendants contend that Elliott, by failing to disclose either Finnerty or the evidence upon which he relied prior to trial, violated the Scheduling Order, pretrial stipulations, and the Pretrial Order and gave rise to misrepresentations to the Court. Defendants also contend that Elliott has submitted new evidence without seeking leave of the Court to amend the Scheduling Order and Pretrial Order, and that Elliott must demonstrate that it would be a "manifest injustice" to exclude the evidence on the interest calculations, a burden which Elliott allegedly has not met.

Defendants further contend that Elliott intentionally violated the Pretrial Order and Scheduling Order so as to complete its scheme to push the amendment to G.O.L. § 5–527 through the New York State legislature, thereby committing a potential fraud on the Court. Defendants sought discovery to that effect. On the representation of Elliott's counsel that the failure to introduce damages evidence at the trial was inadvertent, this Court denied Defendants discovery pertaining to fraud on the court.

Defendants also contend that Elliott's failure to comply with the Scheduling Order— i.e, the failure to disclose evidence of calculations of compound interest—denied Defendants the opportunity to present its viewpoint to the New York legislature.

Finally, Defendants contend that Elliott should not be allowed to reopen the record to

substantiate its damages claim because of a tactical decision not to introduce evidence at trial.

■ These contentions, however, lack merit. As set forth above, during the course of the trial of this action, the Court granted Elliott's motion pursuant to Fed.R.Civ.P. 42 to sever the issue of damages from the issue of liability. Whether Elliott made a tactical decision at that time is of no importance now; the motion was granted and it would be improper to bar Elliott from introducing evidence of damages at this point.

Elliott has now submitted Finnerty's affidavits, containing his calculations based on the various prime rates, in connection with Elliott's motion for summary judgment on the issue of damages. Decision on these motions was adjourned in order to permit Defendants ample opportunity to conduct further discovery, which they have done, deposing Finnerty and reviewing the documents underlying Finnerty's calculations. Defendants have not set forth any alternative interest rates or default dates, but merely state in conclusory fashion that Finnerty's calculations are incorrect and that the rates and dates constitute inadmissible evidence. However, conclusory allegations or denials are insufficient to oppose a motion for summary judgment. *See, e.g., SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978).

■ Moreover, Defendants' assertions regarding the reliability of the evidence of rates do not merit ruling such evidence as inadmissible. Finnerty is a mathematician, not an accountant; thus, Defendants' claims regarding accountants' work papers are irrelevant. More to the point, Finnerty's affidavits have adequately established a basis for the rates he used. Notably, Defendants provide no alternative rates of any sort. If the Defendants genuinely disputed the rates and the default dates from which Finnerty performed his calculations, they certainly had the resources, and were given the time by this Court, to discover such information and present contrasting rates or default dates. Furthermore, many of the rates used by Finnerty were obtained from the Federal Reserve Board website or from Bloomberg and are admissible under Fed.R.Evid. 803(17).

■ Finally, Defendants' contention that Elliott deceived the Court by not disclosing its lobbying efforts in Albany is simply immaterial to the proceedings here. The legislative process is open and the introduction of a bill is a matter of public record. Elliott was not obliged to inform Defendants of its efforts to lobby the legislature.

For these reasons, Finnerty's expert calculations will not be stricken. However, it is appropriate to enter judgment in accordance with Finnerty's revised calculations set forth in Appendix B. Reliance on the available actual historical prime rates and on a conservatively estimated average historical prime rate comports with fairness. The Court notes, however, that the difference between Finnerty's original calculations and his revised calculations is de minimus in light of the total dollar amounts of the damages.

### III. *The Agreements Permit Collection of Compound Interest*

Defendants contend that the Letter Agreements do not contemplate collection of compound interest, notwithstanding the recently amended New York General Obligations Law § 5-527.

The amended New York General Obligations Law § 5-527 provides, in pertinent part:

1. A loan or other agreement providing for compound interest shall be enforceable notwithstanding the date that such loan or other agreement providing for such compound interest shall have been executed; provided, however, that such compound interest shall begin to accrue and become due and payable on the later to occur of (a) June twenty-fourth, nineteen hundred eighty-nine or (b) the date that any obligation to pay such compound interest may have arisen, including, but not limited to, the date of any default or event of default under such loan or other agreement. For purposes of this subdivision, the term "compound interest" shall mean the accruing of interest upon unpaid interest irre-

spective of whether such unpaid interest is added to the principal debt.

The Letter Agreements provide for compound interest "to the extent permitted by applicable law." In 1983, when the Letter Agreements were signed, compound interest was not permitted by New York law, which is the governing law of the Letter Agreements. In 1989, enactment of General Obligations Law § 5–527 changed the law in New York to allow for collection of compound interest. Defendants maintain that the term "applicable law" means the law applicable at the time the Letter Agreements went into effect, not the law applicable at the time of enforcement of the provision.

The language of the Letter Agreements is identical to the language in loan agreements previously construed by this Court in *Pravin Banker*, 912 F.Supp. at 83. In *Pravin Banker*, this Court held that "[i]n the absence of any provision with respect to retroactivity, and in the interest of certainty, the better rule is to interpret the term ["applicable law"] as referring to the applicable law at the time of the agreement, rather than at the time of its enforcement." *Pravin Banker*, 912 F.Supp. at 83. However, in the version of § 5–527 enacted in 1989, which was the version construed in *Pravin Banker*, there was no language concerning retroactive application (i.e., the phrase "notwithstanding the date that such loan or other agreement providing for such compound interest shall have been executed"). The 1989 version simply stated that a loan agreement providing for compound interest was enforceable.

The language of the amended § 5–527 now clearly contemplates retroactive application. To the extent that the amended statute leaves any doubt about the New York Legislature's intent that it apply to the language of the Letter Agreements, such doubt is dispelled by the Legislature's Memorandum of Support for § 5–527 accompanying the amendment, which states in part:

> [Q]uestions have been raised as to whether compound interest is authorized on those contracts which were entered into prior to

June 24, 1989 and which also specifically provided for compound interest where allowed by law. This legislation will ensure that the law clearly sanctions compound interest in such cases where the parties to a transaction had evidenced in an agreement that the financial arrangement would include compound interest where allowed by law. However, the bill provides that interest shall not be compounded prior to June 24, 1989, when the compound interest law took effect.

■ This language indicates the Legislature's clear intent to make application of the compound interest provision retroactive, and to permit enforcement of the compound interest provision going forward from June 24, 1989 notwithstanding the fact that such provision was not enforceable at the time the parties entered into the agreements.

### IV. There Is No Genuine Dispute Regarding the Calculations of Interest on Interest and Compound Interest

Defendants also dispute Finnerty's methodology of calculating compound interest on interest on the matured and unmatured principal. However, as with Defendants' disputes regarding rates and default dates, Defendants have not set forth any alternative calculations of interest, relying on assertions that Finnerty's method and logic is circular while claiming that, absent further discovery, it is impossible to establish whether Finnerty's methodology is correct. Again, there is no genuine dispute regarding Finnerty's methodology and both summary judgment and entry of judgment are appropriate under these circumstances.

### Conclusion

For the reasons set forth above, Elliott is awarded summary judgment in both actions.

Elliott shall submit judgment on notice. Damages calculations (including interest to date) are to be set forth utilizing the 0.0017% smaller rate "alternative calculation" set forth in Appendix B attached hereto.

It is so ordered.

ELLIOTT ASSOCIATES, L.P. V. BANCO DE LA NACION
ELLIOTT ASSOCIATES, L.P. V. THE REPUBLIC OF PERU

EXHIBIT F

Calculation of the Amount Banco de la Nacion and The Republic of Peru Owes Elliott Associates, L.P.[1]
Under the 1983 Loan Agreements

| | Popular due 8/1/92[2] | Nacion due 8/1/88[3] | Nacion due 11/1/88[4] | Combined |
|---|---|---|---|---|
| Principal | $ 13,882,678.95 | $2,000,000.00 | $5,000,000.00 | $20,682,678.95 |
| Interest on Unmatured Principal (Exhibit A) | 265,293.46 | 52,611.22 | 143,055.56 | 460,960.24 |
| Interest on Matured Principal (Exhibits B-1, B-2, and B-3) | 10,119,675.79 | 2,418,571.32 | 5,890,594.36 | 18,428,841.47 |
| Interest on Interest on Unmatured Principal (Exhibits C-1, C-2, and C-3) | 196,210.39 | 61,982.27 | 168,536.46 | 426,729.12 |
| Compound Interest on Interest on Unmatured Principal (Exhibits D-1, D-2, and D-3) | 89,183.83 | 56,492.55 | 144,966.68 | 280,643.06 |
| Compound Interest on Interest on Matured Principal (Exhibits E-1, E-2, and E-3) | 4,599,713.01 | 2,147,547.68 | 5,066,796.58 | 11,814,057.27 |
| Total Amount Due | $28,952,755.43 | $6,737,205.04 | $16,413,949.64 | $52,103,910.11 |

ATTACHMENT "A"

(1) Based on interest accrued through November 16, 1999.
(2) Per the Assignment Agreement between Swiss Bank Corporation, New York Branch and Elliott Associates, L.P., "the last date upon which interest was last paid was May 1, 1992."
(3) Per the Assignment Agreement between ING Bank N.V. London Branch and Elliott Associates, L.P., interest "is in default as of August 1, 1988."
(4) Per the Assignment Agreement between Swiss Bank Corporation, New York Branch and Elliott Associates, L.P., "the last date upon which interest was last paid was August 1, 1988."

## ELLIOTT ASSOCIATES, L.P. V. BANCO DE LA NACION
## ELLIOTT ASSOCIATES, L.P. V. THE REPUBLIC OF PERU

Calculation of the Amount Banco de la Nacion and The Republic of Peru Owes Elliott Associates, L.P.
Under the 1983 Loan Agreements

| Original Lender | | Principal | Interest on Unmatured Principal | Interest on Matured Principal | Interest on Interest on Unmatured Principal | Compound Interest on Interest on Unmatured Principal | Compound Interest on Interest on Matured Principal | Total Amount Due |
|---|---|---|---|---|---|---|---|---|
| **Popular due 8/1/92** | | | | | | | | |
| Banco de Bilbao | (1) | $ 1,766,340.50 | $ 34,247.58 | $ 1,306,393.29 | $ 25,329.66 | $ 11,513.27 | $ 593,803.99 | $ 3,737,628.28 |
| Bank of California | (2) | 124,000.00 | 2,404.24 | 91,710.10 | 1,778.17 | 808.23 | 41,685.14 | 262,385.87 |
| Bankers Trust | (3) | 1,095,407.01 | 21,238.85 | 810,030.82 | 15,705.69 | 7,137.28 | 368,109.63 | 2,317,629.27 |
| Mellon Bank | (4) | 4,338,128.82 | 84,093.13 | 3,208,480.52 | 62,195.29 | 28,269.84 | 1,458,362.02 | 9,179,529.62 |
| Pittsburgh National Bank | (5) | 372,779.96 | 7,227.83 | 275,703.01 | 5,345.61 | 2,429.70 | 125,313.38 | 788,799.47 |
| National Bank of North America | (6) | 860,500.00 | 16,680.50 | 636,316.09 | 12,334.77 | 5,605.36 | 289,164.49 | 1,820,601.20 |
| Shawmut Bank of Boston N.A | (8) | 170,720.04 | 3,309.35 | 126,242.78 | 2,447.17 | 1,112.08 | 57,369.17 | 361,200.58 |
| Irving Trust Company | (4) | 396,007.00 | 7,676.46 | 292,886.72 | 5,677.51 | 2,580.62 | 133,126.78 | 837,955.08 |
| European American Bank | (7) | 87,480.00 | 1,696.15 | 64,740.68 | 1,255.26 | 571.00 | 29,449.92 | 185,193.00 |
| Continental Illinois National Bank | (6) | 990,215.71 | 19,194.99 | 732,237.29 | 14,194.17 | 6,450.33 | 332,754.47 | 2,095,046.95 |
| Marine Midland Bank | (3) | 946,000.00 | 18,407.51 | 699,606.48 | 13,613.12 | 6,187.01 | 317,963.27 | 2,001,777.39 |
| Norwest Bank of Minneapolis | (7) | 1,000,000.00 | 19,389.00 | 739,597.06 | 14,340.05 | 6,518.00 | 336,170.10 | 2,116,014.20 |
| The Bank of New England | (7) | 1,335,120.00 | 25,886.64 | 987,451.48 | 19,145.70 | 8,702.32 | 448,827.96 | 2,825,134.08 |
| National Bank of Detroit | (6) | 200,000.00 | 3,876.93 | 147,894.50 | 2,866.88 | 1,302.81 | 67,208.48 | 423,149.60 |
| **Subtotal** | | $ 13,682,699.04 | $ 265,329.16 | $ 10,119,280.60 | $ 196,229.04 | $ 89,197.87 | $ 4,599,308.83 | $ 28,952,044.59 |
| **Nacion due 8/1/88** | | | | | | | | |
| American Express | (6) | $ 2,000,000.00 | $ 52,602.53 | $ 2,418,183.25 | $ 61,962.06 | $ 56,460.98 | $ 2,146,702.22 | $ 6,735,911.03 |
| **Subtotal** | | $ 2,000,000.00 | $ 52,602.53 | $ 2,418,183.25 | $ 61,962.06 | $ 56,460.98 | $ 2,146,702.22 | $ 6,735,911.03 |
| **Nacion due 11/1/88** | | | | | | | | |
| Chase Manhattan Bank | (3) | $ 2,000,000.00 | $ 57,222.22 | $ 2,353,278.68 | $ 67,329.92 | $ 57,821.77 | $ 2,020,955.10 | $ 6,556,607.69 |
| Crocker National Bank | (3) | 1,000,000.00 | 28,611.11 | 1,177,605.03 | 33,692.59 | 28,952.20 | 1,012,270.94 | 3,281,141.86 |
| Wells Fargo | (3) | 1,000,000.00 | 28,611.11 | 1,177,605.03 | 33,692.59 | 28,962.20 | 1,012,270.94 | 3,281,141.86 |
| The First National Bank of Chicago | (3) | 1,000,000.00 | 28,811.11 | 1,178,069.83 | 33,705.89 | 28,990.35 | 1,013,254.98 | 3,282,632.16 |
| **Subtotal** | | $ 5,000,000.00 | $ 143,055.55 | $ 5,886,558.57 | $ 168,420.97 | $ 144,736.51 | $ 5,058,751.96 | $ 16,401,523.56 |
| **Grand Total** | | $ 20,682,699.04 | $ 460,987.24 | $ 18,424,032.62 | $ 426,612.07 | $ 290,385.36 | $ 11,804,763.01 | $ 52,089,479.18 |

Page 1 of 3

ATTACHMENT "B"    (PAGE 1)

EXHIBIT G

ELLIOTT ASSOCIATES, L.P. V. BANCO DE LA NACION

ELLIOT ASSOCIATES, L.P. V. THE REPUBLIC OF PERU

## Calculation of the Amount Banco de la Nacion and The Republic of Peru Owes Elliott Associates, L.P. Under the 1983 Loan Agreements

**Footnotes:**

(1) The prime rates are obtained from Bloomberg LP. Banco de Bilao informed PwC that they use the prime rates quoted by Bloomberg LP.

(2) The prime rates are obtained from Wall Street Journal. Bank of California merged with Union Bank to form Union Bank of California in 1996. PwC was informed by Bank of California that they use the prime rates quoted by Wall Street Journal.

(3) The prime rates are obtained from Bloomberg LP. Crocker National Bank was acquired by Wells Fargo in 1986.

(4) The prime rates from 11/2/92 to 10/31/99 are Bank of New York prime rates obtained from Bloomberg LP. (Irving Trust was acquired by the Bank of New York in 1989.) However, the prime rates from 5/1/92 to 11/1/92 are not available. PwC used the Federal Reserve Board prime rates less a spread of 0.0017%. This spread is the average difference between the Federal Reserve Board prime rates and the rates for individual lenders whose prime rates are available to PwC.

(5) The prime rates from 5/11/98 to 10/16/98 are obtained from the lender. However, the prime rates from 10/17/98 to 10/31/99 are not available. PwC used the Federal Reserve Board prime rates less a spread of 0.0017%. This spread is the average difference between the Federal Reserve Board prime rates and the rates for individual lenders whose prime rates are available to PwC.

(6) The prime rates quoted by the banks are not available. PwC used the Federal Reserve Board prime rates less a spread of 0.0017%. This spread is the average difference between the Federal Reserve Board prime rates and the rate for individual lenders whose prime rates are available to PwC. National Bank of North America was acquired by NatWest in 1979, which was acquired by Fleet in 1995. Shawmut Bank of Boston was acquired by Fleet in 1995. Fleet will not provide historical information for acquired entities. National Bank of Detroit was acquired by First Chicago in 1995, which was acquired by BankOne in 1999. BankOne will not provide historical information.

(7) The prime rates are obtained from the lenders by fax. Bank of New England was acquired by Fleet in 1991. Fleet faxed the information from BankBoston, which is also part of this corporate entity and has the same historical information as Fleet.

ATTACHMENT B (Page 2)

## ELLIOTT ASSOCIATES, L.P. V. BANCO DE LA NACION
## ELLIOTT ASSOCIATES, L.P. V. THE REPUBLIC OF PERU

Calculation of the Amount Banco de la Nacion and The Republic of Peru Owes Elliott Associates, L.P. Under the 1983 Loan Agreements

|  | Popular due 8/1/92 | Nacion due 8/1/88 | Nacion due 11/1/88 | Combined |
|---|---|---|---|---|
| Total Amount Due, per Affidavit of November 23, 1999 | $ 28,952,755.43 | $6,737,205.04 | $16,413,949.84 | $52,103,910.11 |
| Total Amount Due, per Alternative Calculation[1] | 28,952,044.59 | 6,735,911.03 | 16,401,523.56 | 52,089,479.18 |
| Difference | $ 710.84 | $ 1,294.01 | $ 12,426.08 | $ 14,430.93 |

(1) See page 2 for detail.

ATTACHMENT B (Page 3)